THE CHICAGO, KANSAS & WESTERN RAILROAD COMPANY v. A. C. FISHER, as *Administrator of the estate of George Fisher, deceased.*

1. ACCIDENT *at Railroad Crossing — Contributory Negligence.* Where a person has full knowledge that from 10 to 20 railroad trains pass a certain crossing daily, and knows that a certain railroad train which he has just seen a short distance away may at any moment pass such crossing, and where a temporary gust of wind temporarily fills the air with dust, which is not likely to last to exceed four or five minutes, and which to some extent obscures his view, it is negligence for him to attempt to cross the railroad tracks at such crossing on a fast walk without stopping or looking.

2. ———— *Degree of Care.* In all such cases the degree of care and diligence which the railroad company and the traveler are each required to exercise is that degree of care and diligence which an ordinarily prudent person would exercise under like circumstances, and not any higher or lower degree of care or diligence, and not necessarily that of an ordinary person.

3. ———— *Not Insurer of Safety of Traveler.* A railroad company is not in such a case an insurer of the safety of the traveler, nor required to use means to prevent injuries which shall necessarily and in all cases be sufficient, efficient, and effective.

4. ———— *Duty of Traveler.* It is the duty of the person intending to cross a railroad track where he knows trains frequently pass, and where he knows that one is likely to pass at any moment, to look as well as to listen, and if dust should temporarily obscure his view, to wait until the dust shall pass away before he attempts to cross.

## *Error from Shawnee District Court.*

ACTION by *Fisher* against the *Railroad Company* to recover damages for bodily injuries. Judgment for plaintiff, July 8, 1889. The defendant brings the case to this court. The opinion states the material facts.

*Geo. R. Peck, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error:

1. Under the undisputed facts and the special findings of the jury, the general verdict cannot stand. They show that the plaintiff was guilty of contributory negligence, and judgment should be rendered in favor of the defendant upon the special findings of the jury.

A person about to cross a railroad track is required to make a vigilant use of both his sense of hearing and of sight. This is put upon him as a duty, as a matter of law, and failing in this, he is held, as a matter of law, to be guilty of contributory negligence, and cannot recover, even though the defendant may have been negligent. In Beach on Contributory Negligence, § 63, it is said:

"The requirements of the law, moreover, proceed beyond the featureless generality that one must do his duty in this respect, or must exercise ordinary care under the circumstances. The law defines precisely what the term 'ordinary care under

the circumstances' shall mean in these cases. In the progress of the law in this behalf, the question of care at railway crossings, as affecting the traveler, is no longer, as a rule, a question for the jury. The *quantum* of care is exactly prescribed as a matter of law. In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track. A multitude of decisions of all the courts enforce this reasonable rule."

See, also, *Durbin v. Oregon Rly. & Nav. Co.*, 17 Pac. Rep. 7; *A. T. & S. F. Rld. Co. v. Townsend*, 39 Kas. 119; *McCrory v. C. M. & St. P. Rly. Co.*, 31 Fed. Rep. 531. The case of *Heaney v. L. I. Rld. Co.*, 19 N. E. Rep. 422, decided by the New York court of appeals, is to the same effect. In that case the deceased was held guilty of contributory negligence in crossing the railroad track without waiting for the smoke caused by a passing engine to clear away. *Debbins v. Old Colony Rld. Co.*, 47 Am. & Eng. Rld. Cases, 531. See, also, *Fleming v. W. P. Rld. Co.*, 49 Cal. 253; *Butterfield v. Western Rld. Co.*, 10 Allen, 532.

These cases are directly in point; but the rule is also illustrated in cases where there are a number of parallel tracks, with trains passing up and down; and where the view of the traveler is obstructed by a passing train upon the first track, it is held that he cannot go immediately upon the second track after the train upon the first track has passed, without looking up and down the second track to see if there is an approaching train. In other words, it is the duty of the traveler to wait until this temporary obstruction has passed, and until he can get a clear view of the track which he is about to cross. See, also, *Fletcher v. Fitchburg Rld. Co.*, 21 N. E. Rep. 302; *Allerton v. B. & M. Rly. Co.*, 34 Am. & Eng. Rld. Cases, 563; *Scott v. Pennsylvania Rld. Co.*, 29 N. E. Rep. 289; *Marty v. C. St. P. M. & O. Rly. Co.*, 35 N. W. Rep. 670; *Blight v. Camden & A. Rld. Co.*, 21 Atl. Rep. 995. In *Pennsylvania Rld. Co. v. Bell*, 15 Atl. Rep. 561, it is said:

"A person who was about to cross a railroad track and was struck by a passing engine could not recover, although he testified that before stepping on the track he stopped and

looked and listened, but neither saw nor heard an approaching train. . . . It is in vain for a man to say that he looked and listened, if, in despite of what his eyes and ears must have told him, he walked directly in front of a moving locomotive."

See, also, *Skelton v. L. & N. W. Rly. Co.*, L. R., 2 C. P. 631; *Hamm v. N. Y. C. Rld. Co.*, 50 N. Y. Super. Ct. 78; *Pence v. C. R. I. & P. Rld. Co.*, 63 Iowa, 746; *Holland v. C. M. & St. P. Rly. Co.*, 18 Fed. Rep. 243; *Stubley v. L. & N. W. Rld. Co.*, L. R., 1 Exch. 20; *Moore v. Philadelphia &c. Rld. Co.*, 108 Pa. St. 349; *Mynning v. D. L. & N. Rld. Co.*, 31 N. W. Rep. 147; *Tucker v. N. Y. C. & H. R. Rld. Co.*, 26 N. E. Rep. 916; *Woodward v. N. Y. L. E. & W. Rld. Co.*, 13 id. 424; *Kwiotkowski v. C. & G. T. Rly. Co.*, 38 N. W. Rep. 463; *Merkle v. N. Y. L. E. & W. Rld. Co.*, 49 N. J. L. 473; *Wakelin v. L. & S. W. Rld. Co.*, 29 Am. & Eng. Rld. Cases, note, p. 434.

Further citation of authorities is unnecessary. This case falls within that line of decisions in which it is held by the courts that, where the traveler approaching a railroad track at a crossing has his vision of the track temporarily obstructed, so that he cannot see an approaching train in time to avoid danger, it is his duty, as a matter of law, to wait until this temporary obstruction passes by and until he can get an unobstructed view. This, according to his own testimony and the findings of the jury, the plaintiff failed to do.

2. There was error in giving and refusing to give certain instructions.

An "ordinary" man is not necessarily a reasonably prudent man. *Austin & N. W. Rly. Co. v. Beatty*, 11 S. W. Rep. 858.

The rule is well established, that where the instructions are inconsistent, and the one part correct and the other erroneous, they are all bad, because it is impossible to know which instruction the jury followed. *P. F. W. &c. Rly. Co. v. Bingham*, 29 Ohio St. 374.

The court also left it to the jury to determine whether the defendant was negligent in the failure to have a flagman at

the crossing to warn travelers.   No ordinance of the city required this duty of the railroad company and no statute requires it, and the failure to have a flagman at this crossing would not be negligence, nor would it be a fact from which negligence could be inferred.   The rule which is now established by the weight of authority is, that the failure to have a flagman is not negligence, but the only question is, whether, in view of the presence or absence of this precaution, the train was moved with prudence or negligence.   There is a vast distinction between these two things, and this is a question which should have been clearly presented to the jury.   See *Heddles v. C. & N. W. Rly. Co.*, 42 N. W. Rep. 237, 242, in which a number of cases are cited, and an early Wisconsin case is overruled.   Also, *Crawford v. D. L. & W. Rly. Co.*, 55 N. Y., Super. Ct. 50.   The same view is adopted by this court in *K. P. Rly. Co. v. Richardson*, 25 Kas. 409.

The court also erred in the same instruction in charging the jury that "If the plaintiff was only guilty of slight negligence, and you should find the defendant was guilty of gross negligence, that in such case the plaintiff would be entitled to recover."   This instruction was misleading; for if the plaintiff was guilty of any negligence which contributed to bringing about the injury upon himself, in failing to take any reasonable precaution with respect to making this crossing, he would be guilty of such proximate negligence, and such negligence would not be slight, but would be direct, and such as would contribute to the accident.   See *Herne v. S. P. Rld. Co.*, 50 Cal. 482; *A. T. & S. F. Rld. Co. v. Plunkett*, 25 Kas. 189.

The twenty-ninth instruction should also have been given. It was to the effect that if the employé upon the train saw plaintiff approaching the track, at a point where he might or could have seen the approaching train, the employé had the right to presume that the person so approaching the track in view of the train would stop, and not attempt to cross over in front of the same. *Moore v. Railroad Co.*, 108 Pa. St. 349; *Ohio &c. Rld. Co. v. Walker*, 32 Am. & Eng. Rld. Cases, 121.

3. There was error in the admission of evidence. In cross-examining Mr. Robb, a witness for the defendant, the plaintiff asked certain questions. No question was asked of this witness on the direct examination by the defendant concerning the whistle, and the rule is, that the cross-examination of a witness is limited to the matters brought out in the examination in chief. *Lawder v. Henderson,* 36 Kas. 754. In any event, such a question is an improper one, because it is not for the witness to say what would be a safer method in this case. It is not matter of opinion nor of expert testimony. *City of Parsons v. Lindsay,* 26 Kas. 431; *K. P. Rly. Co. v. Peavey,* 29 id. 178, 179; *I. & S. C. Co. v. Tolson,* 139 U. S. 559, 560; *Sappenfield v. Main Street &c. Rly. Co.,* 27 Pac. Rep. 590.

4. The district court of Shawnee county did not have jurisdiction of this action or over the defendant.

Paragraph 4129, Gen. Stat. of 1889, prescribes where an action of the kind designated against a railroad company may be brought, and the venue must be in some such county. It is exclusive of the courts of all other counties. Where a statute prescribes the courts which may have jurisdiction over a certain class of actions, it necessarily excludes jurisdiction in other courts of the state, and the action must be brought in the county in which the venue may be laid. *L. R. & F. S. Rld. Co. v. Clifton,* 31 Ark. 205, 206; *E. & C. Rld. Co. v. Epperson,* 59 Ind. 438; *I. & C. Rld. Co. v. Renner,* 17 id. 135; *I. & C. Rld. Co. v. Wilsey,* 20 id. 229 ; Rev. Stat. of Ind., 1881, § 4026.

*D. C. Tillotson,* and *J. G. Waters,* for defendant in error:

After summarizing the evidence in the case, counsel for defendant in error say :

Fisher was out in this storm; he believed that it was increasing; he desired to get to his place of business before it did increase; he desired, as men would naturally desire, to get out of the storm, and the only way he could do so was by continuing on his journey to his place of business. Any mistake

of judgment he may have made is not to be charged to him as negligence. The jury heard Fisher's story, and they believed that, placed in the peculiar circumstances he was in, he was guilty of no negligence, and the court below also believed it.

Without going all over creation for decisions, this case comes squarely within the case of *K. P. Rly. Co. v. Richardson,* 25 Kas. 405.

In the case of *Bonnell v. Railroad Co.,* 35 Pa. St. 60, the plaintiff saw the train, and was deceived by appearances, supposing it was going away from the crossing. From the point where the plaintiff said he looked and saw the train, all the way up to the crossing, there was a clear, unobstructed view of the railroad, and there was nothing to prevent him from seeing the train if he had looked in that direction. As he approached the track, some persons made gestures and hallooed to him to warn him of the danger; he says he misunderstood them. The court, in that case, said:

"It was for the jury to weigh all these facts, and say whether his mistake and consequent feeling of security were unreasonable, and manifested a want of proper care."

"Where the evidence is conflicting as to the failure to ring the bell or sound the whistle, and there is positive testimony that the traveler looked and listened, it is not a proper case for non-suit."

36 N. Y. 132; 105 Mass. 203; 118 id. 431; 17 Mich. 99; 38 N. J. L. 525; 47 Pa. St. 244.

In the *Painter* case, this court upheld the finding of a jury of gross negligence where the train was started backward over a public crossing in a populous city, with the brakes on the engine out of repair and useless, with no brakemen at the other brakes, with no flagman or other person at the rear of the train or at the crossing to warn persons of their danger, without the blowing of a whistle, though with the ringing of a bell, and although the jury found Painter guilty of contributory negligence. 14 Kas. 37.

Where a railroad crosses a highway in a city or town, and

the crossing is not protected by a gate or watchman, it is generally the duty of the company to so moderate the speed of its trains that the sound of the whistle or bell can be heard by travelers upon the street in time to give them effectual warning. 28 Minn. 103; 64 N. Y. 535; 10 Cush. 562. Where, however, obstacles prevent him from seeing an approaching train, and no signals are given, he cannot from that fact alone be invariably deemed guilty of contributory negligence. 103 Ind. 31. It is culpable negligence to push a train backward by a locomotive in a reversed position, without warning and in the absence of a lookout. 38 Ill. 482; 51 N.Y. 544; 4 Colo. 30; 66 Mich. 261. The books require the traveler to look and listen; and if he does this, it is for the jury.

If the weather blows a sand storm, so much the greater care from both the railroad and the traveler. This sand storm had prevailed for hours, and was then increasing in virulence. Fisher so believed; the testimony shows that while he wanted to cross, and walked faster than usual to get out of the storm before it got worse, he looked, listened, and had his mind on the crossing — and the jury believed him. The jury found it no temporary obstruction, as it had the right to do.

We think the case of *Railroad Co. v. Morgan*, 43 Kas. 1, is identical with this case throughout.

The other side objects to the instructions of the court, because it did not say a person of ordinary prudence, but did say, "such care as an ordinary person would use at such a place." We suggest that when the court used the words "ordinary person," they were equivalent of ordinarily prudent person, and that the statement was sufficient in itself. The ordinary person is prudent; the law presumes he is. But we are not left to this alone. In addition to that, the court said that he had to exercise "the care and caution that men ordinarily exercise in the presence of danger;" "by the best exercise of his judgment;" "yet if he used the care that men under like circustances exercise;" "whether or not the plaintiff was in the exercise of ordinary care;" "that

even though they should find that the defendant was guilty of all the negligence which it is claimed it was guilty of by the plaintiff, and if they further find that the plaintiff failed to exercise such care as a man of ordinary prudence would have exercised under similar circumstances in making that crossing, then, and in such case, the jury are instructed to find a verdict for defendant."

We call attention to the seventh and eighth instructions of the court, which abundantly show that the jury well understood that the ordinary prudence that men of ordinary prudence must exercise under the circumstances was the measure required of plaintiff.

They claim there was error in the admission of the testimony of a certain witness. If the court will examine the same, it will see that the answers of the witness could not have hurt the railroad company.

We have nothing to say on the charge of misconduct.

*Geo. R. Peck, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error in reply:

Defendant in error is attempting to confound the wind storm with the clouds of dust, which were spasmodic and occasional. No doubt the wind was blowing all day, but it is also true that the wind in no manner affected his vision or prevented him from seeing objects. It was the sand which was temporary and occasional, as all the witnesses testified, and as the jury found. There were times, as the plaintiff well knew, and even had to admit, when the gust of sand or the cloud of dust would pass by one point on to another, and when he would have a free and unobstructed view for quite a distance.

The obligation to sound the whistle is fixed by the statute, and cities and villages are excepted from the operation of the statute. See *Mo. Pac. Rly. Co. v. Pierce,* 33 Kas. 61, 64; *Clark v. Mo. Pac. Rly. Co.,* 35 id. 350.

The case of *Bonnell v. Railroad Co.,* 35 Pa. St. 60, cited in the brief of defendant in error, is evidently an erroneous

citation. The case of *Railroad Co. v Ogier* is reported in that volume upon that page, and is in no sense in point. Whatever may have been decided by early Pennsylvania cases, the court will find the law in that state now well settled in the following decisions: *Railroad Co. v. Beale,* 73 Pa. St. 504; *Railroad Co. v. Feller,* 84 id. 226; *Railroad Co. v. Ritchie,* 102 id. 425; *Allen v. Railroad Co.,* 12 Atl. Rep. 493; *Marland v. C. P. & L. E. Rld. Co.,* 16 id. 623, 624.

The case of *Wheelock v. B. & A. Rld. Co.,* 105 Mass. 203, 208, is not at all in point. In the case of *Craig v. Railroad Co.,* 118 Mass. 431, 437, it appeared that there were buildings on each side of the highway, which prevented the plaintiff, who was driving in a wagon, from seeing the approaching engine until he had driven on to the track; that the gates were not shut, and there was no flag or lantern at the crossing, as was usual when an engine or train was about to pass. The gates being open in that case, and there being no flag or lantern at the crossing, as was usual, he might rely upon these things as an assurance that the train was not about to pass. In the case at bar, Fisher knew that there was no flagman there to give a warning, nor were there any gates which would indicate whether there was a train approaching or not, and he therefore knew that he had to rely upon his own senses.

In the case of the *C. H. & I. Rld. v. Butler,* 103 Ind. 31, cited by defendant in error, is found the following language:

"A traveler should always approach a railway crossing under the apprehension that a train is liable to come at any moment, and while he may presume that those in charge will obey the law by giving the statutory signals, the law will nevertheless require that he obey the instincts of self-preservation, and not thrust himself into a situation of danger, which, notwithstanding the failure of the railroad, he might have avoided by the careful use of his senses."

The Fisher case falls within the decision of Judge BREWER in *McCrory v. Railway Co.,* 31 Fed. Rep. 531, and of the recent New York cases.

In the Morgan case this court cites with approval *Artz v.*

*Railroad Co.*, 34 Iowa, 153, and *Railroad Co. v. Elliott*, 28 Ohio St. 340, in both which cases it was held, that where the evidence showed that the plaintiff might have seen the approaching train on account of no obstacles being in the way, and he testified that he did not see it approach, the court will disregard this testimony. The Pennsylvania cases which we cited in our former brief upon this proposition are to the same effect, and therefore, under these decisions, inasmuch as the jury find, and inasmuch as the witnesses for the plaintiff testified that they heard this train approaching, although farther distant from it than the plaintiff, neither this court nor anyone else can believe that the plaintiff was listening attentively for the approach of the train, for, had he been listening, he would certainly have heard it before it struck him.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought in the district court of Shawnee county on January 28, 1888, by George Fisher against the Chicago, Kansas & Western Railroad Company to recover damages for an injury received while he was attempting to cross one of the railroad tracks of the Atchison, Topeka & Santa Fé Railroad Company in the city of Kinsley. The case was tried before the court and a jury, and the jury rendered a general verdict in favor of the plaintiff and against the defendant, assessing the plaintiff's damages at $3,000; and also, in response to a large number of special interrogatories submitted to them, made numerous special findings. The court rendered judgment in accordance with the general verdict; and the defendant, as plaintiff in error, afterward brought the case to this court for review. After the case was brought to this court, the plaintiff died, and the action was revived in the name of his administrator, A. C. Fisher.

It appears that the injury of which the plaintiff below complained occurred about 1 or 2 o'clock in the afternoon of August 19, 1886. At that time the city of Kinsley had a population of about 1,500, and the Atchison, Topeka & Santa Fé railroad was located and operated through the city, run-

ning in a northeasterly and southwesterly direction. We shall hereafter speak of it, however, as though it ran east and west. Among the streets of the city was Colony avenue, running north and south. Near this avenue, and on the west side thereof, was located the depot or station of the Atchison, Topeka & Santa Fé Railroad Company. The east end of this depot or station was close to the avenue. Three of the railroad tracks supplying this depot or station crossed this avenue, and for two years prior to the injury from 10 to 20 trains had passed over these tracks and across this avenue daily. About 300 feet west of this avenue, and on one or more of these tracks, was a coal chute and also a water tank, where the railroad trains procured coal and water.

For 9 or 10 years prior to the injury, the plaintiff had resided in Kinsley, and for two years prior thereto he had crossed these railroad tracks on Colony avenue, and where the injury occurred, about four times a day. He was well acquainted with all the streets, sidewalks, railroad tracks, the station with its platform, the coal chute, the water tank, and all other things at or near where the injury occurred; and was well acquainted with the manner in which the railroad trains in that vicinity were operated. He resided on the west side of Colony avenue and north of the railroad tracks, but did business on the east side of the avenue and south of the railroad tracks, and he crossed the avenue and the railroad tracks, where the injury occurred, whenever he passed from one place to the other. The day on which the injury occurred was a very windy day — the wind blowing from the south — and at times the atmosphere in some places would be filled with dust. These times of dust, however, were only of short duration, never exceeding four or five minutes. Generally, the atmosphere was comparatively clear. The plaintiff himself testified that some of these gusts of dust would continue for four or five minutes, and some of them not so long. On the day of the injury, and about 1:30 o'clock in the afternoon, the plaintiff was traveling on foot southward, on the west side of Colony avenue, and, some time before

reaching the place where the accident occurred, he saw a train of cars belonging to the defendant railroad company about 300 feet away, and at the coal chute or water tank. The hind end of the train was toward him and toward the east. He looked in the other direction, that is, eastwardly, along the railroad tracks (and he could see in that direction at least two or three miles), and no train was in sight; so he had nothing to fear from that direction; but he had fears that the train at the coal chute or water tank might back up to the crossing where he expected to cross, and he testified that he continued to look until he got within 10 or 12 feet of the railroad tracks where the injury occurred, and to listen all the time. At that time there were a large number of people on the depot platform, variously estimated at from 10 to 30, and there were a number of other people at the time in that vicinity who witnessed the various occurrences connected with the accident. While the plaintiff was moving toward the crossing, the railroad train was also moving backward toward the same place. He was moving at the rate of from three to four miles an hour, while the railroad train was moving at the rate of from five to six miles an hour.

There were no gates, nor was there any flagman or watchman at the crossing, and it does not appear that anything of the kind was ever required by the city or adopted or put in practice by the railroad companies. Whether there was a brakeman on the rear platform of the car nearest the crossing is not absolutely clear. He was probably there, but we shall have more to say with respect to this matter hereafter. The jury made no special finding upon the subject. The engine whistle was not at any time sounded, and it does not appear that anything of the kind was ever required or put in practice at that place, but the reverse. The engine bell, however, was rung; but whether it was rung all the way from the coal chute or water tank to the place where the injury occurred does not appear. From the testimony of some of the witnesses it would seem that it was, and from the testimony of others it would seem that it was not. The jury found specially, that

the bell was rung as the train commenced to move back from the coal chute, but they did not find whether it was rung all the way or not. The engine and train in moving made considerable noise, sufficient to be heard much further away from the train than was the plaintiff, as several witnesses testified; but the plaintiff, as he testified, did not see the train moving, nor hear it, nor hear the bell ring. He could not have been looking or listening. When plaintiff arrived within a few feet from the crossing a gust of wind filled the air with dust, which to some extent obscured his vision. He did not attempt to look after he arrived within 10 or 12 feet from the crossing, as he testified, but which was in fact about $17\frac{1}{2}$ feet from the crossing, as was clearly shown by the testimony of other witnesses, to see whether any train was coming or not. In fact, he pulled his hat down "some," as he admitted, over his eyes, and, probably, in that condition he could not have seen it. If he had looked, however, he could have seen through the dust, as he admitted, from 30 to 40 feet. When he was $17\frac{1}{2}$ feet from the place where the injury occurred, the train was from 25 to 30 feet from the same place, and when he was 10 or 12 feet from that place the train was within 15 or 20 feet of such place, and he could have seen the train at any of these distances if he had looked. He testified that he listened all the time. He did not stop and wait for the dust to pass away, or even slacken his movement, but continued to move forward in a fast walk, and, just as he made the first step to cross the railroad tracks, the hind car of the aforesaid train, as it was moving backward, struck him and he was thrown down, and was so injured that it became necessary to amputate his left leg below the knee, and his leg was so amputated; and this is the injury complained of.

Many persons saw the train and the plaintiff moving toward the same point, and saw the collision. One man on the platform hallooed to him, but he did not pay any attention to it; also the brakeman on the rear platform of the car that struck him hallooed to him, but he paid no attention to it. There is some dispute as to whether there was a brakeman

on the rear platform or hind end of this car or not. Several witnesses testified that they did not see him ; but the brakeman testified that he was there, and the conductor testified that he was there, and some of the witnesses who were on the platform of the depot or station also testified that he was there. The jury did not make any special finding as to whether he was there or not.

The following are the special findings of the jury:

"1. Is it not a fact that prior to the plaintiff's injury, and while he was on the way to the crossing where he was injured, he saw the train which injured him, with the engine, standing at the coal chute or water tank? Ans. Yes.

"2. Is it not a fact that the train referred to in the last question, when it was seen by the plaintiff, was about 300 feet distant from the plaintiff? A. Yes, about that distance.

"3. Did plaintiff, at the time of seeing the train referred to in the first question, have any difficulty in seeing it and cars and each of them composing it, at a distance of 300 feet, when he looked at the same? A. No.

"4. Is it not a fact that, when plaintiff looked at the train at the time and place referred to in the last question, the train was almost directly south from him? A. Yes.

"5. Is it not a fact that, at the time the plaintiff looked at the train referred to in the preceding questions, the wind was blowing almost in a direct line from that direction to plaintiff? A. Yes.

"6. Did the dust in the air at the time plaintiff looked at the train interfere with or prevent plaintiff from distinctly seeing such train? A. It did not.

"7. Is it not a fact that, immediately prior to the plaintiff's crossing the north side-track, on his way to the point where he was struck, he was able to see, and saw, the main line of the A. T. & S. F. Rld. Co. east from the station-house for a distance of about two to three miles? A. Yes.

"8. If the jury answer the last question in the negative, they may state about how far to the east he could see on the main track of the A. T. & S. F. Rld. Co. A. ———

"9. Is it not a fact that, immediately prior to plaintiff's crossing the north side-track, he knew and discovered that there was no engine or train upon the main line east of him for a distance of at least two or three miles, and that he knew

there was no danger to be apprehended from that direction?
A. Yes.

"10. Did the condition of the atmosphere as to sand or dust prevent the plaintiff from seeing to the east of the station-house from two to three miles along the main line of the A. T. & S. F. Rld. Co. immediately prior to his crossing the north side-track? A. No.

"11. Is it not a fact that the plaintiff was perfectly familiar with the crossing at which he was hurt? A. Yes.

"12. Is it not a fact that, for two years prior to his injury, during the business days, he had crossed that crossing at least four times a day? A. Yes.

"13. Is it not a fact that, for two years prior to plaintiff's injury, the station and the track in front of it could be seen from the front end of the room in which plaintiff was engaged in working as a clerk at the time of his injury? A. Yes.

"14. Is it not a fact that, at the time of plaintiff's injury, and for two years prior thereto, this station had been a station at which most of the trains took water and coal that passed through Kinsley on the A. T. & S. F. Rld.? A. Yes.

"15. Is it not a fact that from 10 to 20 trains passed through Kinsley every day for two years prior to the accident? A. Yes..

"16. Is it not a fact that, for two years prior to plaintiff's injury, he was perfectly familiar with this crossing, and had knowledge of the number of trains passing over it every day, and the fact that Kinsley was a coaling and watering station? A. Yes.

"17. Is it not a fact that plaintiff, immediately prior to his injury, knew that this crossing was a dangerous crossing to make from the direction in which he was coming, as to trains moving from the west? A. Yes.

"18. Is it not a fact that, from the time plaintiff saw the train which injured him, with its engine, standing at the coal chute or water tank, that he had that train in his mind and the possible danger to be apprehended from it in making the crossing? A. Yes.

"19. Is it not a fact that the plaintiff, from the time he saw the train which injured him standing by the coal chute or water tank, apprehended in his own mind that there might be danger from that train backing up, and determined in his own mind to guard against danger from it to the best of his ability? A. Yes.

"20. Is it not a fact that the plaintiff, from the time he saw the train standing at the coal chute or water tank, determined to use every precaution to prevent injury to himself from such train by reason of its backing over the crossing which he was intending to make?   A.  Yes.

"21. Was· the plaintiff's mind, from the time he saw the train standing at the coal chute or water tank, occupied or concerned with anything else than the idea of avoiding injury or danger from such train backing over the crossing at the time he was about to attempt to make the same?   A.  Yes; wind, and blowing sand and dust.

"22. Is it not a fact that, from the time plaintiff saw the train in question, he knew and realized that such train would move in one direction or the other as soon as it had finished taking coal or water, or both?   A.  Yes.

"23. Is it not a fact that, at the time plaintiff saw the train standing at the coal chute or water tank, he knew and realized that when it did move it might move back over the crossing which he was attempting to make?   A.  Yes.

"24. From the time plaintiff saw the train in question at the water tank or coal chute, what, if anything, distracted his attention and mind from the thought of that train, and its possible danger to him in backing over that crossing?   A. Wind and sand blowing, as stated in answer to No. 21.

"25. How far from the north rail of the main line of the Santa Fé R. R. Co. was it, at the time of the plaintiff's injury, to the junction of the sidewalk which left the sidewalk on the west side of Colony avenue between the north side-track and the main track and crossed the main track at right angles?   A.  17½ feet, measuring in center of short walk.

"26. Is it not a fact that, just prior to plaintiff's injury, after he crossed the north side-track, that he proceeded along the main sidewalk on the west side of Colony avenue, between the north side-track and the main track, to a point where another sidewalk branches from such sidewalk, and that he took the sidewalk so branching from this west sidewalk and followed it to the railroad track and to a point where he was struck by the train?   A.  Yes.

"27. Is it not a fact that the last time the plaintiff looked to the 'west, for the purpose of seeing whether the train which he previously saw standing at the water tank or coal chute was going or not, was at the point where the sidewalk crossing the main track at right angles left the sidewalk on the west side of Colony avenue?   A.  Yes, about that point.

"28. If the jury answer the last question in the negative, they may state how far the plaintiff was from the north rail of the main track of the A. T. & S. F. Rld. Co. at the time he looked the last time to the west to see if the train which he formerly had seen was approaching or not. A. ————.

"29. When the plaintiff last looked to the west to see if the train which he had formerly seen was approaching, how far to the west along the main track of the A. T. & S. F. Rld. Co. could he see so as to distinguish cars? A. 30 to 40 feet.

"30. Is it not a fact that, in the absence of any dust or sand in the atmosphere, plaintiff could, in the day-time, from the point where he last looked to the west, have seen along the main track of the A. T. & S. F. Rld. Co. to a point beyond the coal chute or water tank where he had previously seen this train standing? A. Yes.

"31. What, if anything, prevented the plaintiff from seeing from the point where he last looked to the west along the main line of the A. T. & S. F. Rld. Co. as far as the coal chute or water tank? A. People on the platform and the dust.

"32. If, in answer to the last question, the jury state that the people on the platform obscured plaintiff's view, they may state what, if anything, would have prevented plaintiff from stepping up onto the platform, and there obtained a clear look to the west so far as such people on the platform were concerned; stating fully. A. Nothing excepting the distance being about 20 feet, and out of a direct line to his place of business.

"33. Would the station building, or any other building, or the people on the platform, have prevented the plaintiff from seeing the train which injured him, if he had looked when he was six feet from the track, in its direction? A. No.

"34. When was plaintiff first enveloped in any cloud of dust or sand, or both, after he crossed the north side-track, with reference to the time he last looked to the west; stating whether it was before or after he so looked? A. After.

"35. Was any cloud of dust or sand which enveloped plaintiff just prior to his reaching the point where he was struck caused by a sudden gust of wind which struck the plaintiff after he had crossed the north side-track? A. Yes.

"36. If the jury answer the last question in the affirmative, is it not a fact that plaintiff knew that if he stopped and waited that such dust and sand would pass away in a short time? A. Yes.

"37. How far west was the plaintiff able to see along the main line of the A. T. & S. F. Rld. Co., when he last looked in that direction?    A.   30 to 40 feet.

"38. State fully what, if anything, prevented him from seeing up as far as the point where he had previously seen the train standing.    A.   The people on platform, and dust.

"39. Is it not a fact that, after plaintiff looked the last time, he pulled his hat down over his eyes and started forward in a hurry to reach his place of business and get out of the storm?    A.   No.

"40. At the point where the plaintiff looked the last time towards the west, what, if anything, would have prevented him from seeing the train which injured him, if he had stopped and waited until the gust of wind which bore the dust and sand which enveloped him had passed away?    A.   People on the platform.

"41. When the plaintiff looked to the west the last time, did he know or realize, if such be the fact, that he could not see to exceed 40 feet on account of the condition of the atmosphere produced by the sudden gust of wind?    A.   Yes.

"42. Is it not a fact that, from the point referred to in the last question, plaintiff went on attempting to cross the track, regardless of whether the train which injured him was moving in his direction or not?    A.   Went on, but not wholly regardless of the train.

"43. If the jury answer the last question in the negative, they may state fully what precaution the plaintiff took against the train which injured him, as he proceeded toward the track from the point where he last looked to the west.    A.   His sense of hearing.

"44. At the time the plaintiff was passing the end of the station building, was the wind blowing very hard or not? State fully.    A.   It was.

"45. If the jury answer the preceding question in the affirmative, they may state if it did not make a considerable noise blowing by the station building and the cars.    A.   We think it would.

"46. If the jury answer the last question in the affirmative, they may state if the wind did not make sufficient noi-e to prevent any person at the east end of the station from hearing the noise made by the running of an ordinary train at the rate of from 8 to 15 miles per hour, when such train would be coming from the west to the east end of the station-

house. A. A direct answer would only be a mere conjecture. Still, in our opinion, a person could hear it.

"47. What was the approximate length of the train which injured plaintiff? A. About 180 feet.

"48. About how far was the engine on this train from the plaintiff at the time it started backward? A. To the pilot of engine, about 340 feet."

"50. Is it not a fact that the wind was blowing hard enough at and prior to the time when the plaintiff was struck to carry the sound of the ringing of the bell on the engine north from the railroad track at such a distance to the west of plaintiff as to materially, if not quite, prevent his hearing the same if it was rung? A. Would have a tendency to do so, and possibly did.

"51. Was plaintiff enveloped with dust or dirt by a sudden gust of wind at the point at which he last looked toward the west? A. No.

"52. Did any sudden gust of wind envelop the plaintiff with dust at any time prior to the time when he was within a step of the railroad track? A. Yes.

"53. Is it not a fact that, at the last time he looked to the west, his view was obstructed to some extent by the people standing on the platform of the station? A. Yes.

"55. If a watchman had been, or was, stationed on the rear end of the train in question, what was the greatest distance that such watchman could have seen the plaintiff, if he had kept a vigilant lookout prior to the train striking plaintiff? A. 35 to 40 feet.

"56. What would have prevented plaintiff, if he had looked, from seeing the train at as great a distance as a watchman stationed on the rear end of the train could have seen plaintiff? A. The disadvantage of wind and sand blowing in his face.

"57. When the plaintiff looked to the west the last time, is it not a fact that he saw as far along the track to the west as he could in a clear day? A. No.

"58. What, if any, obstruction did the dust make to plaintiff's view to the west the last time he looked? A. Prevented him from seeing but 30 to 40 feet.

"59. Is it not a fact that the gust of wind which, it is alleged in plaintiff's petition, suddenly enveloped plaintiff with dust, enveloped him with such dust just as he was about to step on the track, if at all? A. No.

"60. If the jury answer the last question in the negative,

they may state if such gust enveloped the plaintiff prior to the time when he was within three feet of the track? A. Yes.

"61. Is it not a fact that persons from 10 to 40 or 50 feet from the approaching train heard the bell ringing, or the noise of the train as it approached the crossing? A. Yes.

"62. If you answer the last question in the negative, state how far such persons were who heard the bell ringing, or the noise made by the approaching train as it neared the crossing, and before it struck the plaintiff, and give as near as you can the positions of such persons. A. ——.

"63. How far is it from the point where the short side-walk branches off from the main sidewalk on the west side of Colony avenue, between the north side-track and the main track, to the north rail of said main track where the same is intersected by said short sidewalk? A. 17½ feet.

"64. Was not the engine bell rung as the train commenced to move back from the coal chute? A. Yes.

"65. At what rate of speed was plaintiff traveling when he was struck? A. From three to four miles per hour.

"66. At what rate of speed was the train which struck the plaintiff traveling when it struck plaintiff? A. Five to six miles per hour.

"67. How far to the west was plaintiff able to see, the last time he looked to the west prior to being struck? A. 30 to 40 feet."

It is difficult to understand upon what theory the plaintiff should recover in this case. From the evidence and the special findings of the jury, it does not appear that the railroad company, by any act or omission on its part, did or omitted anything in contravention of law or the city ordinances, or good morals or common prudence; or that it acted in any manner different from what had been the general custom of the railroad companies at that place for all the years previous to that time; while the plaintiff voluntarily encountered a known danger, admittedly without exercising his eye-sight for a period of time sufficient to enable him to walk 10 or 12 feet, in fact 17½ feet, and brought himself into collision with a moving railroad car, which he admitted he could have seen for 30 or 40 feet through the dust, and which others saw and heard at a much greater distance. If the plaintiff had stopped

when he arrived within five or six feet of the railroad tracks

1. Accident at railroad crossing—contributory negligence. and waited until the dust had blown away, he could have seen westwardly in the direction from which this train was coming for many hundred feet along the railroad tracks; but he did not stop nor look, but chose rather to encounter the danger blindly. The general verdict of the jury must have been founded upon some mistake. It is possible, and indeed probable, that the jury were misled by the instructions of the court. The court below instructed the jury, among other things, that the law requires a person, in traveling over a street intersected by a railroad, "to use such care as an *ordinary person* would use at such a place," and that "in the exercise of care and prudence *he has the right to decide for himself,* the means of which judgment is found by the best exercise of his judgment, and though his judgment in the premises may be wrong, yet if he used the care that *men* under like circumstances exercise, negligence cannot be imputed to him for such mistake of judgment." The court also instructed the jury as follows:

"A railroad company, in the operation of its trains over a public traveled street in a city, is required to exercise a *high degree of diligence and care.* It is required to give *sufficient and timely warning,* and take such precautions as shall be *efficient* at the time and place, under the circumstances. The law does not require any precise warning or precaution to be used by the railroad company. The railroad company has the liberty of choice, but *the law does require whatever warnings or precautions are taken shall be sufficient or effective;* and what these warnings or precautions should be it is for the jury in the light of the evidence to say. You may take into consideration whether the train is backed upon the crossing with increased dangerousness of propulsion; the distance the train had to go to reach the street or crossing; whether or not *timely* and *efficient warning* was given, considering the elements, the wind, the flying sand or dust; *whether there were safer or surer signals* of its approach to the crossing within its command and failed to be used; the speed of the train; the obscurity of the track from buildings or clouds; the failure to have a flagman at the crossing to warn travelers; and if you find from the evidence that there was no brakeman on the rear platform or

31 — 49 KAS.

end of the passenger coach, then you may consider this fact, and all the facts and circumstances proved, to determine whether or not. proper care and diligence were used in moving the train over the crossings of the street. . . . I further instruct you that negligence is want of diligence; common or ordinary negligence is the want of that degree of care which an ordinarily prudent man would ordinarily exercise under like circumstances; slight negligence is merely the failure to exercise great or extraordinary care; gross negligence is the want of slight diligence. The degree of care and diligence necessary and proper in each case varies according to the surrounding circumstances in each particular case, and *the jury from all the circumstances must decide what degree of diligence and care is necessary and proper* under the circumstances of the case proved: . . . The plaintiff could not push on through a *temporary* sand or wind storm and take the risk of misfortune, *unless* you find from all the facts and circumstances proven that a man of ordinary care and caution under like circumstances *would be justified in doing as the plaintiff did in this case.* . . . What might be ordinary care for a traveler or employé of a railroad under favorable conditions, might not be ordinary care for either traveler or employé of a railroad under different conditions; and where a railroad [train] backs down across an avenue where people are and have the right to travel, *a higher degree of care should be exercised by the railroad employés.*"

The italics in the foregoing instructions are ours. Before proceeding further, we might say that each party in cases like this, the plaintiff or the defendant, is required to exercise that degree of care and diligence which an ordinarily prudent person would exercise under like circumstances, and is not required to exercise any greater or higher degree of care or diligence. This degree of care and diligence is usually denominated "ordinary care or diligence;" while a want of this degree of care and diligence is usually denominated "ordinary negligence." The foregoing instructions start out with saying that the care to be exercised by the plaintiff in a case like this is that of an "ordinary person," and not that of an ordinarily *prudent* person under like circumstances, and that in the exercise of

2. Degree of care.

such care such person "has the right to decide for himself" as to the means; and if he exercises "the care that *men* under like circumstances exercise, negligence cannot be imputed to him, although he might be mistaken." As opposed to this, see *Lierman v. C. M. & St. P. Rly. Co.* (Wis.), 52 N. W. Rep. 91. It will also be noticed that the court says "ordinary persons" and "men," and not "ordinarily *prudent* persons" or "*ordinarily prudent men.*" In Texas, it has been held that the use of the words "ordinary man," instead of the words "ordinarily *prudent* person," is prejudicially erroneous. (*A. & N. W. Rld. Co. v. Beatty*, 73 Tex. 592, 596; same case, 11 S. W. Rep. 858, 859, 860.)

As to the railroad company, the court below instructed the jury that it must exercise "a high degree of diligence and care," and "give *sufficient* and timely warning, and take such precautions as shall be *efficient;*" that "the law does require, whatever warnings or precautions are taken [by the railroad company] shall be *sufficient* or *effective,*" and that the jury may take into consideration "whether or not timely and *efficient* warning was given," and "whether there were *safer* and *surer* signals of its approach to the crossing within its command" or not. These instructions make the railroad company an insurer against collision, whatever the plaintiff might do. The degree of diligence exercised by it must, under the instructions, be "high," "sufficient," "efficient," and "effective." Timely and "*efficient*" warning must have been given, and it is a matter for the jury to consider whether there might not have been "*safer*" and "*surer*" signals. This is also a virtual instruction to the jury to find for the plaintiff, for the reason that in fact "sufficient," "efficient" or "effective" signals or warnings were not given to prevent the injury to the plaintiff, for the plaintiff was in fact injured. *The defendant did not in fact prevent it.* And there might have been "*safer*" and "*surer*" signals or warnings. An employé of the railroad company, for instance, might have walked ahead of the moving train and have given notice to all persons who were likely

<span>3. Not insurer of safety of traveler.</span>

to attempt to pass in front of it, and have prevented such persons by force, if necessary, from encountering the danger. The court also instructs the jury with respect to the degrees of care and diligence on the one side, and the want of care or diligence on the other side, and then states that "the jury from all the circumstances must decide *what degree* of diligence and care is necessary and proper," leaving it to the jury to say that the plaintiff might recover, although he was guilty of ordinary negligence, but not guilty of the highest possible degree of negligence, and that the defendant would be liable although it might not be guilty of ordinary negligence, but only of the *slightest* possible degree of negligence. This is all wrong and against all authority.

Both parties must, in all cases like the present, exercise ordinary care and diligence, and neither is required to exercise any greater or higher degree of care or diligence. Of course, whether the performance or omission of any particular act or acts constitutes ordinary care and diligence, or not, depends upon all the numerous and varied surrounding circumstances, including the relations existing between the parties, and the duty or duties that one may owe to the other; but the *degree* of care or diligence that each must exercise as toward the other never varies. It is always ordinary care and diligence, and neither the court nor the jury can vary it. The court also says that the plaintiff would not be justified in passing through "a *temporary* sand or wind storm" and taking the risk of misfortune "unless" "a man of ordinary care and caution under like circumstances would be justified in doing as the plaintiff did;" and while the court seems to recognize the general principle that ordinary care is the care which a railroad employé should generally exercise, yet the court says that, under the circumstances of this case, "a *higher degree* of care should be exercised by the railroad employés." As we have before stated, neither the railroad company, including its employés, nor the plaintiff, is required in cases like this to exercise any degree of care *higher* or greater than ordinary care. Among the various cases which might be cited tend-

ing to support the view that the plaintiff, under the facts and circumstances of this case, should not recover, see the following: *U. P. Rly. Co. v. Adams*, 33 Kas. 427; *A. T. & S. F. Rld. Co. v. Townsend*, 39 id. 115; *McCrory v. C. M. & St. P. Rly. Co.*, 31 Fed. Rep. 531; *Heaney v. L. I. Rld. Co.* (N. Y.), 19 N. E. Rep. 422; *Scott v. Penn. Rld. Co.* (N. Y.), 29 N. E. Rep. 289; *Debbins v. O. C. Rld. Co* (Mass.), 47 Am. & Eng. Rld. Cases, 531; *Fletcher v. Fitchburg Rld. Co.* (Mass.), 21 N. E. Rep. 302; *Butterfield v. Western Rld. Co.* (92 Mass.), 10 Allen, 532; *Allerton v. B. & M. Rld. Co.*, 34 Am. & Eng. Rld. Cases, 563; *Hauser v. Central Rld. Co.* (Pa.), 23 Atl. Rep. 766; *Blight v. C. & A. Rld. Co.* (Pa.), 21 Atl. Rep. 995; *Flemming v. W. P. Rld. Co.*, 49 Cal. 253; *Marty v. C. St. P. M. & O. Rly. Co.* (Minn.), 35 N. W. Rep. 670.

We think the judgment of the court below must be reversed. In our opinion, it is the duty of any person intending to cross

4. Duty of traveler.

a railroad track where he knows that trains frequently pass, and where he knows that one is likely to pass at any moment, to look as well as to listen, and if dust should temporarily obscure his view, to wait until the dust shall pass away before he attempts to cross.

The judgment of the court below will be reversed, and the cause remanded, with the order that judgment be rendered upon the special findings of the jury in favor of the defendant and against the plaintiff.

All the Justices concurring.