## MANLEY v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. June 12, 1897.)

RAILROAD CROSSINGS—CONTRIBUTORY NEGLIGENCE—VIEW OBSTRUCTED BY SMOKE.
It is the duty of one approaching a railroad crossing, and finding the view he would otherwise have of approaching trains obstructed by smoke, to wait until the smoke lifts, before going on the crossing.

Appeal from special term, Niagara county.

Action by Fred Manley against the New York Central & Hudson River Railroad Company. From a judgment on a verdict for plaintiff, and from an order denying a new trial on a case made (42 N. Y. Supp. 1076), defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, and GREEN, JJ.

Charles A. Pooley, for appellant.

P. F. King, for respondent.

HARDIN, P. J. Plaintiff's complaint alleges that on the 5th day of June, 1893, he was passing along, over, and upon Eighth street, which is a public highway in the city of Niagara Falls, "where said defendant's tracks intersect said street," and that he "was then and there struck, * * * knocked down, his foot and leg smashed and broken, and his body and limbs otherwise bruised, maimed, and injured." Defendant's answer admits the incorporation of the defendant, and that it operates and maintains a steam railroad, and that its tracks cross Eighth street, in the city of Niagara Falls, and denies the other allegations of the complaint. At 5:30 p. m. of the day the plaintiff was injured, he was struck by a switch engine, which, with five or six freight cars attached, was backing down to switch the cars upon another track. Some 50 feet west from where plaintiff was struck was an iron railroad single-track bridge, spanning the hydraulic canal. The engine and cars passed over the bridge and the intervening space of some 50 feet before striking him. The owners of the hydraulic canal were engaged in widening it, and had in use a dredge, hoist, and drills, and the broken rock taken from the canal had been dumped on the bank of the canal and in Eighth street, forming a large pile, which came down within 3 or 4 feet of the track of the railroad. An open space or way along this stone pile had been left for passage of persons, but the opening was not wide enough for two teams to pass. The plaintiff passed through the passage, as he had been accustomed to do; and, when he was 3 or 4 feet from the track, he testifies he stopped, looked, and listened, and that he could see into the middle of the bridge, which was 110 feet long, thus giving him an unobstructed view for a space of 105 feet from where he stood; and, as he approached nearer the track, he could see further along the track, and through the bridge. A civil engineer called by the plaintiff testified that at 3 feet from the track a person could see clear through the bridge. The plaintiff testified that, after looking towards the bridge, he turned his gaze in the opposite direction, and then, without looking again towards the

bridge, he stepped forward, and upon the track, and then, when he was in the middle of the track, he heard the rumbling of the train, and turned, and looked around, and saw the engine 10 or 12 feet from him; and that, before he could get off the track, he was struck and injured. John Davis was the only other eyewitness to the accident. There was a conflict in the evidence as to whether the bell was rung, and as to the speed of the train. Davis testifies that the train was going some 25 miles an hour. Several witnesses, however, testified that it was going 3 or 4 miles an hour. At the close of the plaintiff's evidence, the court denied a motion for a nonsuit; and a similar motion was made at the close of the entire evidence, which was denied, and an exception was taken.

In the course of the plaintiff's narration of the circumstances attending the accident, he testified that the train which struck him was approaching from the west, and that, when he looked to the west the second time, he was about the middle of the north-bound track. The plaintiff says that the train was not on the bridge at the time he looked across the bridge. It came across the bridge. And then the witness was interrogated, and testified as follows:

"Q. You mean to say that it was not on the bridge at all when you looked? A. No, sir; I couldn't see it. Q. Do you mean to say it was not on there? That is what I ask you. A. I don't think it was on the bridge. Q. Not on the bridge at all? A. Not when I looked. Q. And then you were three or four feet away from the track? A. Yes, sir. Q. You mean to say that engine went across that bridge 110 feet, and went 50 feet further, until it got up to you, and you not know anything about it? A. Yes, sir. Q. And not see it? A. No, sir. Q. That is what you mean to say? A. I didn't see it until it was too late. Q. Then you were standing three or four feet from this track? A. Yes. Q. Fifty feet away from the bridge? A. Yes. Q. And you could, at that point, see halfway through the bridge? A. Yes. Q. That you did not look towards that bridge again until you got up on the track, is that right? A. Yes. Q. And then, when you say you got up on the track, that engine was only from six to twelve feet away from you? A. Yes, sir. Q. You never knew anything about its being there at .all until you turned around, and saw it right there, six or twelve feet away from you? A. I heard it when I got on the track, and that is what caused me to look down to the west again. I heard a rumbling noise. I don't think it was on the bridge. I think .he had crossed the bridge. I heard the rumbling noise after it got off the bridge, traveling this 50 feet. It continued rumbling right along before it struck me, and just after it got off the bridge; made noise enough to attract my attention. Q. And yet you allowed it to travel this 50 feet before you looked around? A. I looked around as soon as I heard it. Q. You say you heard it all the time, that it was rumbling along there after it got off the bridge, did you not? A. I didn't say that I heard it from the moment it left the bridge."

In the course of his redirect examination the following appears:

"Q. Counsel said to you that, if you looked before you stepped on the track, you could see the engine coming. Where could you see the engine coming if you looked? A. It was halfway across the bridge. Where I stood when I looked was at the corner of the stone heap. When I got so that I could look around the stone heap, I looked. In looking from that point, it is not a straight line from that point across the bridge; runs on an angle. That smoke blew northwest, as near as I could tell; so that when I looked up east, after I passed, it obstructed my view eastward, as well as west. It was thick, black smoke, such as would come when they are putting on a fresh fire. This passenger train on the other track was going in the same direction with the freight train that hit me. I turned around as quick as I heard the noise when I got on the track, and made an effort to get off the track. I didn't take any

time to make any observations. I jumped back. I cannot tell accurately whether it was six or twelve or twenty feet; might be any of those distances. The Court: That passenger train, then, was ahead of the freight train? A. Yes, sir. Q. And do you say that the smoke of the passenger engine blew back upon you? A. Yes, sir. Q. And you think obscured the view of the freight engine, is that your idea? A. Yes, sir."

In the course of his recross-examination the following occurred:

"Q. Now, you just answered your counsel * * * that the smoke cleared off of the track to the east of you,—that is, towards Buffalo? A. Yes, sir. Q. But it hadn't cleared off of the track to the west of you, towards this bridge? A. No, sir. Q. And when you looked there, before you started to go on the track, this heavy, dense smoke was in this bridge? A. Yes, sir. Q. And so continued how long? A. I didn't say it continued. The smoke that rolled past me from the east went over that bridge, and through that bridge. Q. Yes; but, from the time the bridge was obscured from the smoke, you hadn't looked into it? You did not look when the smoke cleared out of the bridge? A. I was looking in the opposite direction. This dredge that I speak of, and the crusher and those drills, were all over the other side of this stone pile from me. I could not see the dredge nor the crusher."

Davis testifies to the circumstances preceding and occurring at the time of the accident, and he says:

"There was smoke there at that time that hung around in the bridge a little. * * * There was a good deal of smoke around there."

He describes the wind, and says that it was such that it would "blow the smoke right to us"; and he says that it was smoke from the crusher, and from the train too. And, again, he says, in answer to a question, "The wind would blow it [smoke] right to him. It would blow it; came this way when we were standing."

In the course of the charge, the trial judge said:

"It was the duty of the plaintiff, when he approached this crossing, to look and listen."

And further on he says:

The plaintiff "claims that, in making those observations, he looked both ways, and listened. Was he, therefore, negligent? That is for you. Should he have looked to the west again before he ventured upon this track? It is claimed by the learned counsel for the defendant that the evidence is, so far as the plaintiff's testimony went, that, when he looked to the west in the first place, he discovered smoke in the bridge; that the claim now is that he should have looked again, as he could see but a little ways west when he first looked, before he took his hazardous step. It is for you to say, gentlemen, whether that contention is right, whether he should have exercised that additional caution. if you find that he exercised the other cautions that the testimony would seem to indicate."

After the body of the charge had been delivered, the counsel for the defendant said, viz.:

"I ask the court to charge that if his vision was obstructed by this temporary volume of smoke, that it became his duty then to wait until the smoke had cleared away before attempting to cross the track."

The request was declined, and the defendant took an exception. The refusal to charge as requested seems to have been put upon the ground that the court had already charged upon the point involved in the request. Upon closely reading the charge and instructions given in response to certain previous requests, we fail to find that the precise proposition stated in the request had been explained or announced to the jury.

In Foran v. Railroad Co., 64 Hun, 510, 19 N. Y. Supp. 417, it appeared that the plaintiff, who went onto the track, and was injured, could have seen the train, except for the smoke; and it was held:

"That it was his duty to wait until the smoke lifted, and that his failure to do so amounted to contributory negligence."

In the course of the opinion delivered by Macomber, J., he refers to Heaney v. Railroad Co., 112 N. Y. 122, 19 N. E. 422, and says that in that case—

"It was stated in the opinion of the court, in substance, that, where smoke obscured the approach of a train, it was the duty of a passer-by to wait until the smoke had lifted, so that he could see that it was safe for him to make the crossing."

In the course of the opinion delivered in the Heaney Case it was said:

"According to the plaintiff's evidence, the deceased, after entering upon this opening in the fence upon the defendant's track, went straight ahead, regardless of the smoke which was between him and the track on which he was struck. * * * We think it was unquestionably his duty to await the disappearance of the smoke, and thus to be reasonably sure that he had a clear crossing. * * * If it was a body perceivable as contrasted with other objects, it was, to a greater or less extent, an obstruction or embarrassment to the vision. * * * Where a person voluntarily places himself in a position of peril, under circumstances which render him less able to protect himself by the use of his senses, he cannot fairly be deemed competent to complain of a consequent injury as due wholly to the acts of the other party."

In Whalen v. Railroad Co. (Sup.) 15 N. Y. Supp. 941, the Heaney Case was referred to and followed, and the opinion states, viz.:

"Either the engine by which she was struck was in plain sight when she stepped upon the track, or it was obscured by a cloud of smoke; and it was negligence on her part to attempt the crossing until the smoke should be so far dissipated as to enable her to see whether an engine was close upon her."

It is claimed in behalf of the respondent that McNamara v. Railroad Co., 136 N. Y. 650, 32 N. E. 765, modified to some extent the doctrine of the Heaney Case. In the course of the opinion delivered in the latter case it is said:

"We think that there is such a marked and material difference in the facts between that case and the one at bar that it is inapplicable as authority."

And, in further speaking of that case, the court says:

"The day was dark, and his vision was obscured by smoke which had settled upon the track. Here the facts are wholly different."

That case was referred to in Lortz v. Railroad Co., 83 Hun, 271, 31 N. Y. Supp. 1033, and it was said in the opinion that the doctrine of the Heaney Case had not been "at all disturbed by the later case of McNamara v. Railroad Co."

We think the doctrine of the cases to which we have referred requires us to hold that the learned trial judge committed an error when he refused to yield to the request which was made. See, also, opinion of Hardin, P. J., in Vahue v. Railroad Co. (decided at this term) 46 N. Y. Supp. 359.

Several other questions have been discussed in the argument, which need not be considered, in view of the conclusion we have

reached that the exception just considered presents an error requiring a reversal.

Judgment and order reversed, and a new trial ordered, with costs to abide the event.    All concur.