12505

JACOBS *ET AL.* v. ATLANTIC COAST LINE R. CO. *ET AL.*

(145 S. E., 146)

April, 1926.

*Messrs. L. C. Wannamaker, M. J. Hough,* and *D. W. Robinson,* for appellants,

*Mr. P. A. Murray, Jr.,* for respondents,

October 2, 1928.

The opinion of the Court was delivered by MR. CHIEF JUSTICE WATTS.

The statement and statement of issues are:

"This action was commenced in January, 1926, for the purpose of recovering damages for the death of the child of plaintiffs which it was alleged was caused by the negligent, willful and wanton acts of the defendant as set forth in the complaint.

"The cause came on for trial before Honorable C. C. Simms, presiding Judge, and a jury at the April, 1926, term of Common Pleas for Chesterfield County. Upon the close of the plaintiff's case, the presiding Judge granted a nonsuit as to willfulness, wantonness and recklessness.

"Upon the close of all the testimony, the presiding Judge directed a verdict for the defendants on the grounds that even if the acts of the defendants, or either of them, in emitting the steam as alleged in the complaint were negligent, that such acts were not the direct and proximate cause of the injury and death of plaintiff's intestate.

"From order of nonsuit and from the directed verdict for the defendants the plaintiff appealed to the Supreme Court and by the exceptions hereinafter set out challenged the holdings and rulings of his Honor, the presiding Judge."

The appellant contends that the issues are:

"1. Whether or not there was any evidence to submit to the jury on the question of punitive damages.

"2. Whether or not the injury and death of plaintiff's intestate was caused by the negligent and willful acts of the defendants, or either of them.

"3. Was the injury and death of the plaintiff's intestate due to an independent, intervening cause, or was such intervening cause merely one of the proximate and concurring causes of the injury and death, and was the act or acts of the defendants, or either of them, another combining and concurring proximate cause of the injury and death?"

The respondent contends that the issues before this Court are:

"1. Whether or not there was any evidence to submit to the jury on the question of punitive damages.

"2. Whether or not there was any evidence of negligence to submit to the jury.

"3. Whether or not the acts of the defendants, or either of them, in emitting the steam, if negligent, were the direct and proximate cause of the injury and death of plaintiff's intestate."

Exception 1 is to granting of nonsuit by his Honor as to punitive damages. This exception is overruled; under the evidence his Honor was clearly right, as there was no evidence by which punitive damages could be found.

The position of the appellants is that the intestate was crossing the railroad at a regular public, much-used street crossing; that the defendants, the railroad and its engineer, by their negligent manner in operating the train, had let out a large quantity of steam, which apparently moved away from the railroad crossing and then, by the operation of the laws of nature, was carried back across it, rendering the use of the crossing unsafe and dangerous and confronting the intestate and the driver of an automobile with a sudden and unexpected peril; that the driver of the automobile, when the steam had cleared away and apparently rendered the crossing safe, started to use the crossing, and while using it in a safe and prudent manner, the steam was suddenly wafted back over it, obstructing his vision and that of the intestate, and a collision occurred between the two on the crossing, resulting fatally to the intestate; that the acts of the defendants were at least proximate causes of the injury, even if they combined and concurred with an act of the driver of the automobile, and the plaintiff had a right to hold either or

all of the tort-feasors responsible. This was for the death of Nephi Jacobs, a child of the plaintiffs, 10 years old, by reason of a collision between the child and an automobile driven by Boyd Braddock, a cousin of the child, at the crossing of a public street and the Atlantic Coast Line Railroad. The collision occurred because the driver of the car, and doubtless the child also, were both blinded by steam left on and covering the crossing after the train had backed off from it. The suit is against the railroad and its engineer for unnecessarily, recklessly, and wantonly causing and permitting steam to be emitted at this crossing, obstructing and obscuring the vision of the driver and of the child; and for providing no safeguard signals or warnings.

There is no dispute about the fact that the railroad itself lies in the center of an opening or street 130 feet in width, which is used on both sides of the railroad as a street and is known as Atlantic Coast Line avenue or street, and that another street, designated on the map as Second Street, crosses this street and the railroad, and runs in a northwestern direction towards the main business part of the Town of Cheraw. The defendant, Johnson, states that this is a public crossing, and that he knew it was a public crossing. See, also, Judge's ruling, also testimony of defendant's witness Harper.

The width of the street crossing of the railroad at that time was very narrow, to wit, 16 feet by actual measurement of the civil engineer, Gillespie. L. F. Braddock puts it by estimation 18 feet. Defendants' witness, M. A. Quick, put it something like 15 or 16 feet. And the defendants' witness, Harper, puts it 12 or 15 feet; probably 16. The crossing was later, after the accident, made wider.

There are a considerable number of houses east of this crossing, situated both on Railroad Street and on Second Street, only a few of which are shown on the map, and one of

these houses was the home and dwelling place of this child and its parents. At the time of the accident, there was on the west side of the crossing and nearest to it two frame store buildings, one of which was of considerable size, and was burned after that time and is not shown on one of the maps. This building left the open or driveway between it and the depot rather narrow, and may have had something to do with turning the stream of steam emitted by the engine as it backed, so that it came back over the crossing and caused or contributed directly to the accident.

L. F. Braddock, who occupied the store building which afterwards burned, knew and fixed its size as exactly 50 by 50 feet. There were several manufacturing enterprises situated on the east side of this crossing and in the neighborhood of it. Several hundred people lived on these streets just east of the crossing. All schools were situated to the west of this, up towards or in the main part of the town. And this was the crossing used by and for all the children. This street was also the natural crossing to go to and from McDonald's store.

The railroad has a Y on the track or tracks coming in from Florence and Wadesboro. The train uses this Y, turning completely around on it, either at night or in the morning coming in from Florence or going out back towards Florence. In fact, so far as known, it always heads in and the next morning backs out on another leg of the Y, thus enabling it to turn around and go back towards Florence. Mr. Johnson, who was the engineer, tells us he found this custom when he started on this line four months before, and that he would not change it without an order.

The train was in the habit of letting out steam at and over the crossing sometimes, and sometimes it did not, and the steam was more considerable at times than at others. As it moved on this particular morning, it let out much steam. Witness testified that they had to stop and wait for the steam

to move out of the way before crossing. The steam comes out through cocks, which shoot or press it out near the ground and at each side, and this has a tendency to blind or obstruct the vision of those who are on foot.

The witness L. F. Braddock, says:

"Yes, sir; it would blind anyone crossing at the time the steam came out. It came out in large quantities."

And the same witness says that the steam traveled over to this building and then back.

It was entirely practicable and safe to avoid letting off steam at the crossing. And this defendant, Johnson, states:

"Well, if I saw anybody, I would shut it off. I would not blow steam on anybody."

And also says that he did not see any one that particular morning. But further examination of his testimony shows that his attention was not called to it until suit brought eight months later, and he did not remember anything about what happened that morning. Likewise, the conductor, Jeffords, offered by defendant, and the fireman, John Rainey, had no recollection of occurrences of that morning. Furthermore, the testimony of the defendant, Johnson, shows that he backed the train down to the depot the first thing that morning and stood there 10 or 15 minutes. His own evidence shows that if he had opened the cocks while his engine stood near the depot, all steam would have disappeared long before the train moved. And doing so would have inconvenienced and endangered no one.

Leaving time of the train on this morning, in accordance with its regular schedule, was 6:50 a. m., at that time. This was the time when people went to work. There was no flagman, watchman, or other protection. The intestate had gone from his home, which was on the east side of the railroad, to McDonald's store. His father had been over

there and was returning home and met him, and the boy went on to get something which he wanted to bring home for breakfast. He was then evidently returning across this crossing.

Boyd Braddock, whose car struck him, had driven up to the crossing, had stopped for the train, and after the train passed, letting out a large amount of steam, awaited until the steam on his, the east, side of the track, had passed beyond him, and saw the other steam passing well beyond him to the west, and then started across the track. As he got on the track, the steam on the west side, either because of the house, or more likely because of the wind, moved back into his face and enveloped him, preventing him from seeing. He was blinded by the steam and, while going very slow, stopped as quickly as possible, but struck some object which turned out to be the boy, who fell under the car and crept out between the front and hind wheels of his car, which was then on the side track of the crossing. There is no dispute about the fact that he did not see the boy before he struck him. The accident happened on Thursday. The child was taken to the hospital in Florence, gradually grew worse, and died there on the next Wednesday. The child was 10 years old. He was in good health and a bright child.

We think there was sufficient testimony to carry the case to the jury, and his Honor was in error in directing a verdict for the defendant under the cases of *Miller v. A. C. L. Ry.*, 140 S. C., 170, 138 S. E., 675; *Key v. C. & W. C. Ry.*, 144 S. C., 172, 142 S. E., 336; *Callison v. Charleston & W. C. Ry.*, 106 S. C., 129, 90 S. E., 260; *State v. DesChamps*, 126 S. C., 420, 120 S. E., 491; *Mack v. Railway*, 52 S. C., 336, 29 S. E., 905, 40 L. R. A., 679, 68 Am. St. Rep., 913; *Duggins v. R. C. L.* (March 31, 1928); *Cooper v. Richland County*, 76 S. C., 202, 56 S. E., 958, 10 L. R. A. (N. S.), 799, 121 Am. St. Rep., 946; *Sandel v. State*, 115 S. C., 180, 104 S. E., 567, 13 A. L. R., 1268;

*Green v. Railway Co.,* 131 S. C., 134, 126 S. E., 441, 38 A.
L. R., 1448; *Howell v. Union-Buffalo Mills,* 121 S. C., 137,
113 S. E., 577; *Cannon v. Lockhart Mills,* 101 S. C., 59, 85
S. E., 233; *Rhodes v. So. Ry.,* 139 S. C., 146, 137 S. E., 434;
*Johnson v. A. C. L. Ry.,* 142 S. C., 155, 140 S. E., 443;
*Goodwin v. Columbia Mills,* 80 S. C., 551, 61 S. E., 390;
*Bridger v. Railway Co.,* 27 S. C., 463, 3 S. E., 860, 13 Am.
St. Rep., 653.

There must be a new trial as to actual damages, if any,
and the judgment of the Circuit Court is reversed and cause
remanded for a new trial.

MESSRS. JUSTICES BLEASE, STABLER and CARTER concur.

MR. JUSTICE COTHRAN (dissenting) : This is an appeal
from a judgment in favor of the defendants, entered upon
a verdict directed by the presiding Judge, Hon. Carroll C.
Simms, Special Judge, at April term, 1926.

The action is for damages, against the railroad company
and its engineer, on account of the alleged wrongful death
of a young son of the plaintiffs. The boy was killed, not by
any instrumentality or agency of the railroad company, but
by being run over by an automobile driven by one Brad-
dock, practically on a railroad crossing of a public street
in the town of Cheraw.

The alleged negligence of the defendants (the railroad
company and engineer), relied upon by the plaintiffs for a
recovery of damages against the railroad company for the
death of the child, which was caused by one not connected
with the company, is that in operating its train, crossing the
street, the railroad company, by its engineer, caused to be
emitted from the engine such a screen of steam as obscured
the vision of the boy who was approaching the crossing from
the west, and the vision of Braddock who was crossing in
an automobile from the east, preventing them from observ-
ing and avoiding one another, causing the collision.

The evidence tended to establish the following facts:

The railroad company's track in the Town of Cheraw runs practically north and south. The station depot is on the west side of the track. About 75 feet south of the depot, there is a public street, crossing the railroad track. At the crossing point the street is much narrower than the street which comes down to the depot from the center of the town and is extended beyond the crossing. In front of the depot are two parallel tracks; the one nearest the depot is a side or passing track, and the other is the main line.

At the time in question the railroad company operated a train between Florence and Cheraw. It usually arrived at Cheraw after dark and left in the morning for Florence about 7 o'clock. When this train would arrive at Cheraw, it was customary to run it up a hundred yards or so and park it on the main line for the night. The fire in the engine would be banked until morning. In the morning, as the fire was started, it became necessary to release the condensed steam (water) out of the cylinders. On the morning of the accident, the engine to which the passenger cars were attached was backed down to the depot to take on passengers, baggage, mail, and express, and stopped for some 15 or 20 minutes. In order to get the train properly headed for Florence, it had to be backed down the main line, crossing the street referred to, and turned on a Y track, some distance south of the depot. As it left the depot, the cylinder cocks were opened to continue the discharge of water from the cylinders, and as the engine passed over the crossing a quantity of steam enveloped the crossing and the immediate approaches on each side. The train moving backward, the engine emitting the steam was the last to pass the crossing.

The plaintiffs lived on the east side of the railroad, and it appears that that morning the mother of the boy had sent him on some domestic errand to McDonald's store,

which was on the west side of the railroad, about 100 yards from the crossing. It is apparent that the boy had fulfilled his mission and was returning by the street which crossed the railroad. In the meantime one Braddock, in an automobile, approached the crossing from the east side. When he reached a point some 15 or 20 feet from the crossing, the backing train impeded his progress; he stopped his car about that distance from the track until the train should pass. As it passed, the escaping steam obscured his vision beyond 15 or 20 feet away. Notwithstanding this, he started up his car as soon as the engine had cleared the crossing, crossed through the steam over the main line track, and was in the act of crossing the parallel side track, when he ran his car into the boy on the west side of the main line track, inflicting injuries from which he died a few days thereafter.

Upon this evidence his Honor, the presiding Judge, directed a verdict in favor of the defendants, upon the ground that there was in the case no evidence of negligence on the part of the railroad company; but that, assuming that the company was negligent in emitting the steam in such volume at the public street crossing, it could not have been the proximate cause of the injury to the boy, which manifestly was the independent, intervening act of the driver of the automobile.

The plaintiffs have appealed from the judgment entered upon the verdict so directed; and it is now proposed to reverse that judgment upon the ground that the issues should have been submitted to the jury.

In my opinion there was no escape from the direction of a verdict; his Honor's action was entirely justified and should be sustained by this Court.

The liability of the railroad company, under the circumstances, depends upon a solution of the following questions:

1. Did the deceased, at the time of his injury, have an

interest which was entitled to the protection of the railroad company?

2. Did the conduct of the railroad company subject the deceased to a hazard against which its duty to him required protection?

3. Could the harm to the injured interest of the deceased have been reasonably anticipated by the railroad company at the time, and as a consequence, of the conduct complained of, as probable, by a person of ordinary prudence, situated as was the defendant; that is, can its conduct be deemed negligence?

4. If the conduct of the railroad company complained of can be deemed negligence, can it be said to have been the proximate cause of the injury sustained by the deceased?

I. *Did the deceased, at the time of his injury, have an interest which was entitled to the protection of the railroad company?*

Undoubtedly this question must be answered in the affirmative. The deceased was a traveler upon the street, in the lawful exercise of a right to use the street in crossing the railroad track. He had the right of immunity from an injury which might result from the negligent exercise by the railroad company of its right to run its trains upon its track and over the particular street crossing. That was the measure and extent of his rights.

II. *Did the conduct of the railroad company subject the deceased to a hazard against which its duty to him required protection?*

In the present case the interest of the deceased, which was entitled to protection, was immunity from personal injury which might result from a breach of the railroad company's duty in operating its train over the crossing; the hazard which the deceased actually encountered was being struck by

the automobile of another traveler making the crossing at practically the same time; the rule invoked by the plaintiff is the common-law rule which requires the railroad company to operate its train, at a public highway crossing, with due regard to the rights and interests of travelers thereon, exercising their right to cross; the conduct of the railroad company, which is asserted to have constituted a breach of that rule and duty, is the emission of a screen of steam over the crossing, which prevented the colliding parties from seeing one another in time to avoid a collision.

The issue, *eo limine,* is whether or not that conduct subjected the interest of the deceased to a hazard against which the rule required protection.

As is said by Prof. Green of Yale University in his learned treatise, "Rationale of Proximate Cause," p. 66:

"This is not saying that as a matter of fact there was a hazard, or that defendant violated the rule, for these are matters of fact for the jury. It is merely saying that, assuming the hazard and the violation of the rule, the Court must of necessity determine whether such a peril is protected by the rule *under any circumstances*—a matter of defining the limits of the rule, or the protection afforded by it. \* \* \* *It is a problem solely for the Judge.*"\*

The normal hazard against which a traveler at a railroad crossing is protected is a collision with the train. As a protection against it, the statute requires certain signals to be given by those in charge of the approaching train; and even

---

\* I have underscored the words "under any circumstances," for the purpose of suggesting that they should more accurately have been, "under the circumstances of the particular case." The issue presented to the Judge would arise upon a demurrer to the complaint, upon a motion for a nonsuit, or upon a motion for a directed verdict, when the question would naturally be whether the circumstances of the particular case afforded any evidence tending to show that the hazard actually incurred was protected against by the rule invoked.

when such signals may be given, the common law requires the train to be operated with such care as the circumstances require; under certain circumstances the installation of safety devices, the erection of gates, the placing of flagmen or watchmen, may under the common-law rule be found by a jury to have been reasonably required. In occasional instances the protection may extend against hazards incurred by the frightening of teams by reason of unnecessary noises, and to hazards incurred by reason of the unreasonable and unnecessary blocking of crossings by trains. This is the first time in my experience or observation that a railroad company has been called upon to assume a hazard not at all created by it, but by the rashness of one in no wise connected with it, and whose conduct was not induced by or reasonably to be expected from anything that the company did.

Braddock, the automobile driver, the immediate author of the catastrophe, gives a most incredible account of the occurrence. Charity would suggest that he was overwhelmed with the horror of slaying the boy, and was groping for some ground of exculpation. He testified that he stopped his car within 15 or 20 feet of the crossing waiting for the backing train to clear the crossing; that while sitting in the car at that distance, as the engine passed, the steam enveloped his car and for the moment blinded him; that it passed beyond him, and that he then started across the track, but that the steam on the west side of the track crossed the street, struck the front of a building 60 feet away, and rebounded to the main line by the time he reached it, thus obscuring his vision; in other words, that the steam on the east side was wafted toward the east, beyond where his car had stopped, and that in the meantime the steam on the west side had wafted toward the west for 60 feet and rebounded to the track.

Notwithstanding his testimony, the Court cannot shut its eyes to well-known physical laws; steam is volatile, quickly

condensed into water, particularly in contact with the wall of a building; the impossibility of his story is apparent.

It appears that the cylinder cocks were opened to allow the escape of the water that had accumulated in the cylinders during the night, which would necessarily diminish the quantity of steam. If the emission had been all steam, it would have been a physical impossibility for it to have assumed the quality of a rubber ball attributed to it by the driver.

III. *Could the harm to the injured interest of the deceased have been reasonably anticipated by the railroad company at the time, and as a consequence, of the conduct complained of, as probable, by a person of ordinary prudence; that is, can such conduct be deemed negligence?*

Admitting that the first question above stated should be solved in favor of the plaintiff, if the second question should be solved in favor of the defendant, the case comes to an end. This result may be reached by holding either that under no circumstances, as suggested by Prof. Green, or under the circumstances of this particular case, the evidence does not tend to show that the hazard actually incurred by the deceased was protected against by the rule invoked.

But if it should be held that the issue under the second question should be solved in favor of the plaintiff, the third question above stated arises, upon the determination of which the existence of actionable negligence on the part of the defendant depends.

If the only inference reasonably to be drawn from the evidence is that it could not have been, it was the duty of the Judge to so declare, and to direct a verdict for the defendant, for then there would have been no actionable negligence on the part of the railroad company.

In order that the emission of a steam screen at the crossing should be regarded as negligence, so far as the injury to

the deceased is concerned, it must appear that the railroad company should have anticipated that both the deceased and the automobile driver would attempt at the same time to penetrate that screen practically in total darkness; at least, a time when it obscured the view of both at the danger point, conceding the possible verity of the driver's account.

It seems to me impossible to conclude that a person of ordinary prudence could have anticipated such a conjunction of circumstances. The much-discussed and much-confused issue of proximate cause, therefore, becames no longer a controvertible or even a discussible one; for that issue can arise only upon the assumption that the prime act was a negligent act.

As is said in the case of *Milwaukee & St. P. R. Co. v. Kellogg*, 94 U. S., 469, 24 L. Ed., 256, largely quoted:

"The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?"

See, also where emphasis is laid upon the wrongful or negligent character of the prime act: *Goodlander Co. v. Oil Co.* (C. C. A.), 63 F., 400, 27 L. R. A., 583; *Cole v. German Society* (C. C. A.), 124 F., 113, 63 L. R. A., 416; *Jarnagin v. Assoc.* (C. C. A.), 133 F., 892, 68 L. R. A., 499; *Travelers' Ins. Co. v. McConkey*, 127 U. S., 661, 8 S. Ct., 1360, 32 L. Ed., 308.

Much confusion, as pointed out by Prof. Green, has been caused by assuming that the prime cause was an act of negligence, passing over the important issue of whether it was or not, and making causation determinative of that issue. He illustrates the point as follows, at page 78:

"In *Sharp v. Powell*, defendant washed a van in a public street. The water ran down the gutter to a grating leading

to a sewer. The grating being frozen over the water spread over a portion of the street and froze. Defendant was not shown to have known that the grating was obstructed. Plaintiff's horse while passing over the place slipped on the ice and broke its leg. Grove, J., said: 'I think the act of the defendant was not the ordinary or proximate cause of the damage to the plaintiff's horse, or within the ordinary consequences which the defendant may be presumed to have contemplated, or for which he is responsible. The damage complained of was not proximately caused by the original wrongful act of the defendant.'

"It would be difficult to imagine a clearer case of causal relation. But this was not the problem. There was merely no basis for finding that defendant should have anticipated as a probable result of his act any harm to plaintiff's interest which was in fact injured. This issue would have been for the jury but there was no evidence of negligence. It was the Judge's function here to direct a verdict for lack of evidence. But as has been done in numerous cases the Judge assumed defendant's conduct to be wrongful and then denied causal connection between the act and the hurt. He erred in both particulars."

IV. *If the conduct of the defendant complained of can be deemed negligence, can it be said that such negligence was the proximate cause of the injury sustained by the deceased?*

In so far as the deceased is concerned, I do not think that the emission of steam at the crossing, in the excessive volume claimed by the plaintiffs, can be considered an act of negligence. The engine had been standing all night; water had accumulated in the cylinders; to allow it to remain there threatened the destruction of the cylinders and possible injury to the crew and passengers. It was a perfectly proper thing to do. So long as the emission did not create a normal hazard, the engineer was within his rights to allow the steam to escape with the accumulated water in any volume. That

it did not create a normal hazard, one reasonably to be expected, I think is perfectly clear. The hazard was created by the act of the automobile driver, not by the presence of the steam, which in itself was harmless.

But assume that it was an act of negligence to flood the crossing with a cloud of steam, it would have been entirely innocuous had it not been for the independent act of Braddock in attempting to cross through it.

If his statement should be accepted at its face value, it discloses an inexcusable act of rashness on his part. The bed of the street as it crossed the railroad tracks was only 16 feet wide, barely sufficient space for two automobiles to pass each other. If he could not see the boy on the side track a few feet from him, he ran the risk of colliding head-on with another car, or of running into a pedestrian who was as reckless of consequences as himself.

Is that such a consequence of obscuring the crossing with steam, as the railroad company should have reasonably anticipated?

The witnesses for the plaintiffs who testified to the popular use of the crossing by laborers going to work and school children going to school, but aggravate the recklessness of Braddock in driving through the alleged screen of steam, any one of whom he may have collided with when he could not see his way.

The evidence shows, and common sense teaches that he had only to wait a few seconds for the steam to dissipate. He could not wait, and as the learned Judge so aptly characterized it, it is but additional evidence of the mad rush of the age, particularly with automobiles. It is conceded that the day was unclouded, the sun shining brightly, and the witnesses for the plaintiffs testified that, what common sense teaches, under those circumstances the steam would almost instantly be dissipated.

In *Oleson v. Lake Shore & M. S. R. Co.*, 143 Ind., 415, 42 N. E., 739, 32 L. R. A., 152, the Court said:

"Under the circumstances, it was his duty to wait in a place of safety until he could see and hear, and thus, with reasonable certainty, ascertain that no westbound train was approaching on the south track. *If the obstruction had been of a permanent character, the question would be a different one, but here the smoke was, as he knew, but a temporary obstruction; and, if he had but waited a few moments, he could have seen the approaching train, and avoided the injury.*" (Italics mine.)

So in the case at bar, where he sat in his car 12 or 15 feet from the main line track, and could see only 15 or 20 feet ahead of him, and knew that the pass track was beyond the main line, and knew that the cloud of steam was only a temporary or fleeting obstruction which would lift or clear in a few moments, it was his duty to wait until he could see, and if he had waited the injury could have been avoided.

I do not know that any such case has ever arisen, but I assume that the driver of an automobile has no right on the public highway to create a screen of smoke in front of a following car, unnecessarily and unreasonably; and that if the following driver should suffer injury, as a direct result of such wrong, the first driver would have to answer for it; but if the following driver, seeing the situation, should attempt to drive through the smoke screen, and in doing so should collide with an oncoming car, injuring a passenger therein, such passenger could hardly contend that the negligent act of the first driver was the proximate cause of the collision.

If Braddock had been struck by a train following the other, could there have been a question as to his contributory negligence? Or, if he had collided with another automobile on or near the crossing, of his negligence?

In *Heaney v. Long Island R. Co.*, 112 N. Y., 122, 19 N. E., 422, the Court said:

"According to the plaintiff's evidence, the deceased, after entering * * * upon the defendant's track, went straight ahead, regardless of the smoke which was between him and the track on which he was struck. * * * We think it was unquestionably his duty to await the disappearance of the smoke, and thus to be reasonably sure that he had a clear crossing."

It was held in *Foran v. New York Cent. & H. R. R. Co.*, 64 Hun, 510, 19 N. Y. S., 417, that where one drives on a railroad crossing when the smoke which has suddenly descended from a neighboring factory obscures the view which he would otherwise have had of an approaching train, he cannot recover for an injury from a collision with the train; that as the traveler could have seen the train if it had not been for the smoke, in such case it was his duty to wait until the smoke had lifted, so that he could see that it was safe to make the crossing.

To the same effect are *Whalen v. New York Cent. & H. R. R. Co.*, 61 Hun, 623, 15 N. Y. S., 941; *McCrory v. Chicago, M. & St. P. R. Co.* (C. C.), 31 F., 531.

"It is the duty of any person intending to cross a railroad track where he knows that trains frequently pass, and where he knows that one is likely to pass at any moment to look as well as to listen, and, if dust should temporarily obscure his view, to wait until the dust shall pass away before he attempts to cross." *Chicago, K. & W. R. Co. v. Fisher*, 49 Kan., 460, 30 P., 462.

"One who goes on a railroad crossing while the smoke left by a passing train still obscures her vision, so that she could not see an approaching engine, is guilty of negligence." *McNamara v. New York Cent. & H. R. R. Co.*, 64 Hun, 637, 19 N. Y. S., 497.*

---

* Reported in full in the New York Supplement; not reported in full in Hun Reports.

"One who attempts to cross railroad tracks without looking in either direction, though the view is unobstructed, or if he looks and sees that the view is obstructed by smoke from a locomotive, which has just passed, but does not wait for the smoke to clear up, is negligent." *Lortz v. R. Co.,* 83 Hun, 271, 31 N. Y. S., 1033.

"Where a person approaches railroad tracks at a highway crossing, the view of which is obstructed by smoke emitted by the engines, it imposes greater care on him to use his senses to ascertain whether the train is approaching." *Pittsburgh, C., C. & St. L. R. Co. v. Peters,* 1 Ohio Cir. Ct. R., 34.

"Deceased, in crossing a railroad with five tracks, had crossed four tracks walking his horse, and was killed on the last track. He had stopped 5 or 10 feet from the tracks, looked and listened; and the track, ordinarily visible for a mile, on the day of the accident was obscured by smoke from a receding train at the distance of about 100 feet. Held, that the deceased was guilty of contributory negligence." *Beynon v. R. Co.,* 3 Pa. Dist. R., 308.

"A view of the tracks, in the direction from which the train came, otherwise obtainable for 900 feet, was obstructed, further than for 100 feet, by smoke left by a train which had just passed; and plaintiff's decedent, after stopping to look and listen 15 feet from the crossing, but without waiting for the smoke to rise, attempted to cross five tracks, and was killed while walking his horse over the fifth. Held, that though the train was running forty miles an hour, without warning or headlight (it being at dusk), plaintiff could not recover." *Beynon v. R. Co.,* 168 Pa., 642, 32 A., 84.

Where two railroads run parallel to each other, and the steam and smoke from the train of one shut off the view of a train on the other, it was the duty of persons approaching the track of the latter to stop before crossing until the

smoke and steam had disappeared and rendered approaching trains visible. *Keller v. R. Co.,* 183 N. Y., 67, 75 N. E., 965.

"It is the duty of one approaching a railroad crossing, and finding the view he would otherwise have of approaching trains obstructed by smoke, to wait until the smoke lifts, before going on the crossing." *Manley v. R. Co.,* 18 App. Div., 420, 45 N. Y. S., 1108.

"One who walks upon the tracks of a railroad, at a high-way crossing, when they are so obscured by smoke from a train just passed that nothing can be seen for some distance from the crossing, is guilty of such contributory negligence as to bar a recovery for an injury received by being struck by a train on the crossing." *Vahue v. R. Co.,* 18 App. Div., 452, 46 N. Y. S., 359.

"It is negligence which will defeat recovery for injuries received at a crossing for a traveler to undertake to cross where the atmosphere is more or less clouded by steam and smoke, without waiting for the atmosphere to clear, so that his vision may not be obstructed, or taking other adequate means to ascertain the presence of danger." *Baltimore & O. R. Co. v. McClellan,* 69 Ohio St., 142, 68 N. E., 816.

"One who, immediately after a train has passed on one track, and while the air is filled with dust and smoke, crosses the track, and is struck by another train, is guilty of contributory negligence." *Hovenden v. Railroad Co.,* 180 Pa., 244, 36 A., 731.

"Decedent, a man of experience forty-nine years old, was struck and killed while crossing a railroad track at a crossing, by a train being backed over the crossing without a lookout on the rear car. The locality comprised a network of tracks crossing the street at different points, and, at the time of the accident, engines were passing and repassing thereon making noise incident thereto. The train by which decedent was

struck was obscured by steam emitted from other engines and he stepped on the track without looking or listening. Held, that decedent was guilty of contributory negligence as a matter of law precluding a recovery for his death." *Baker v. R. Co.,* 44 Wash., 575, 87 Pa., 826.

"Plaintiff, who approached railroad crossing in automobile at from fifteen to eighteen miles an hour, after dark, and, when a rod from crossing, drove into cloud of smoke which obstructed view of train standing on crossing and against which he ran, held contributorily negligent." *Fannin v. R. Co.,* 185 Wis., 30, 200 N. W., 651.

"The obstruction to view of train by smoke from a train which had just passed is so temporary that its existence does not excuse the failure to wait until a view was possible, unless there was urgent reason for haste, so that one whose testimony showed that he attempted to cross a track while his view was so obscured by smoke was contributorily negligent as a matter of law." *Lee v. R. Co.,* 180 N. C., 413, 105 S. E., 15.

"Where the plaintiff and his employee, who was driving his automobile, discovered, just before they were about to cross a railroad track, that their view * * * was obstructed by * * * smoke from engines * * * on another track, it was contributory negligence * * * to proceed to cross without stopping and waiting or going to some point where a view of the track could be obtained, if there was no other way of determining whether a train was approaching." *Acker v. R. Co.,* 106 Kan., 401, 188 P., 419.

The conduct of Braddock must be measured by the same yardstick as if he had been sued for the death of the child. If he had, I think that there could be no question, under the circumstances, of his liability. As a matter of course, if it be shown that there intervened, between the prime act of negligence and the injury, an act which was not the proximate result of the prime act, and which is relied upon as a link

in the chain, the chain is broken, relieving the prime act from the imputation of the proximate cause of the injury.

It will be observed that this is not a case like the *Green case,* lately decided by this Court, where it was alleged that the negligence of the railroad afforded an opportunity and an inducement, a temptation, for the independent criminal act of a third person. The screen of steam offered no opportunity, inducement, or temptation for the driver of the automobile to proceed over the crossing; on the contrary, it presented a deterring barrier to such cause; and if, notwithstanding such barrier, he voluntarily proceeded, unable to see his way, it seems to me clear that his act, uninduced but rather discouraged by the alleged act of the railroad company, was an intervening act of negligence, directly, proximately, causing the injury, and breaking the connection between the alleged prime act of the railroad company and the injury.

"Whenever a new cause intervenes, which is not a consequence of the first wrongful cause, which is not under the control of the wrongdoer, which could not have been foreseen by the exercise of reasonable diligence by the wrongdoer, and except for which the final injurious consequences would not have happened, the second cause is regarded as the proximate cause and the other as the remote cause." 22 R. C. L., 132, citing many cases.

Repeating what appears in my dissenting opinion in the *Green case,* which is now before the Supreme Court of the United States (49 S. C., —, 73 L. Ed., —), my conception of the law of proximate cause is this :

It is important in determining whether a given act was the proximate cause of the injury complained of, to observe the two classes in which the question arises; those in which the injury is the immediate result of the prime act, and those in which the injury is not the immediate result of the prime act, but is the immediate result of an intervening act. In the first class, it is ordinarily conclusive, if the injury is

the immediate result of the act. On the other hand, the fact that an injury has resulted immediately from an intervening act, and not immediately from the prime act, is not necessarily conclusive of the question in favor of the defendant; for the intervening cause may itself have been the immediate result of the prime act, a result naturally to be expected or foreseen, probable to have happened in the natural course of events, and the proximate result. So that the test of the proximate character of the prime act as a cause, whether in reference to the injury, which has followed immediately from it, or in reference to the intervening cause which itself has immediately produced the injury, is whether naturally, in the ordinary course of events, probably in a manner which should have been foreseen or anticipated, the prime act was the injury, if immediate, or the intervening cause if not.

The leading case in this State upon the subject is *Harrison v. Berkley*, 1 Strob., 525, 47 Am. Dec., 578. There the defendant sold liquor in violation of a statute, to a slave. The slave became intoxicated, lay out in the cold, and died in consequence. The owner of the slave sued the seller of the whiskey for the death of the slave. The defendant contended that his unlawful act in selling the liquor was not the proximate cause of the death of the slave, and upon this point much discussion was had. It was decided that the result of the defendant's illegal act was one naturally and reasonably to be expected, and was not, therefore, too remote from the prime cause. This is the crucial test of the question. The Court concluded that it was but natural that the slave should drink the whiskey; that he should become intoxicated; that he should be exposed to the very cold weather and should die. They say:

"Where the mischievous purpose of a slave is manifest, or should be foreseen by ordinary prudence, the injurious act embraces the will of the slave, as one of its ingredients;

the wrong consists, in part, in ministering to the purpose, and natural consequences of that purpose, * * * are the legal consequences of the injurious act."

And again:

"Thus, without any unconnected influence to be perceived, the death has come from the intoxication, which the defendant's act occasioned. The defendant cannot complain that an agent [agency], which his own act naturally brought into operation, has occurred to produce the result."

The Court further declared:

"The connection is usually enfeebled, and the influence of the injurious act controlled, where the wrongful act of a third person intervenes, and where any new agent, introduced by accident or design, becomes more powerful in producing the consequence, than the first injurious act. (8 East., 1; 1 Esp., 48.) It is, therefore, required that the consequences to be answered for, should be natural as well as proximate. (7 Bing., 211; 5 B. & Ad., 645.) By this, I understand, not that they should be such, as upon a calculation of chances, would be found likely to occur, nor such as extreme prudence might anticipate, but only, that they should be such, as have actually ensued one from another, without the occurrence of any such extraordinary conjuncture of circumstances, or the intervention of any such extraordinary result, as that the usual course of nature should seem to have been departed from. In requiring concurring consequences, that they should be proximate and natural to constitute legal damage, it seems that in proportion as one quality is strong, may the other be dispensed with: That which is immediate, cannot be considered unnatural; that which is reasonably to be expected, will be regarded, although it may be considerably removed."

In *Felder v. Louisville, C. & C. R. Co.*, 2 McMul., 403, a slave lay down on a track, which was foul with high grass and weeds, and was run over. The plaintiff alleged negligence in allowing the track to be in such a condition

that the engineer could not see the slave in time to stop. The Court held that the alleged negligence was not the proximate cause of the death, but the intervening act of the slave was. The Court says:

"There are two causes which  *  *  *  have contributed to this result. The first is the grass being so high as in some measure to restrict the view of the engineer, and thereby preventing him from guarding against accidents as effectually as he otherwise might have done; and the second, that of the boy voluntarily and with reckless imprudence placing himself in danger, so as to bring upon himself the catastrophe. The one was a remote source of danger and could not be regarded as a proximate or necessary cause of the accident.  *  *  * It would be to make the company not only liable for its own negligence, but for injuries arising from the fault and imprudence of others, and they strangers, too, in nowise connected with the employment of the company."

In *Richardson v. Wilmington & M. R. Co.,* 8 Rich., 120, a slave lay down on the track and was run over. The plaintiff alleged negligence in having a board fence near the cattle guard, which obstructed the view and prevented the engineer from seeing the slave in time to stop. The Court held that the alleged negligence was not the proximate cause of the death, but the intervening act of the slave was.

In *State v. Rankin,* 3 S. C., 450, 16 Am. Rep., 737, the Court said:

"The mere erection of the mill and dam on his own land was no nuisance; and if results, though injurious, yet not proximate and direct, followed, because set in motion by the acts of others, either in cutting the ditch, which, by the accumulation of sand, choked the channel and raised it higher than the adjacent banks, thus forcing the water over the edges of the ditch or banks and collecting it in pools or holes, or from the increased cultivation in the neighborhood, it would seem that the consequences are to be referred to an

agency operating on the property of the defendant, for which he should not be liable, because not employed by him. They were not proximate or direct, in the legal sense in which those terms are understood. He must be held accountable for the unlawful effects which naturally or directly proceeded from his acts."

In *Hill v. Port Royal & W. C. R. Co.*, 31 S. C., 398, 10 S. E., 93, 5 L. R. A., 349, the Court said:

"In civil cases, a defendant is not responsible for results, except such as are natural, proximate, and direct. If such consequences are caused by the acts of others, so operating on his acts as to produce the injurious consequences, then he is not liable."

In *Cooper v. Richland County*, 76 S. C., 202, 56 S. E., 958, 10 L. R. A. (N. S.), 799, 121 Am. St. Rep., 946, the Court discusses quite fully and clearly the doctrine of proximate cause. That discussion arose upon appeal from an order sustaining a demurrer to the complaint, which alleged that the plaintiff's horse got caught by the foot in a defective bridge; that in attempting to extricate him the plaintiff was injured by the horse. The Court overruled the order sustaining the demurrer upon the ground that "the act of the plaintiff was such as might reasonably and naturally have been expected from a man of ordinary prudence actuated by a commendable desire to relieve an animal from an extremely dangerous position," and said:

"What in law is a proximate cause is well expressed in the definition found in the case of *R. R. Co. v. Kellogg*, 94 U. S., 469, 474 [24 L. Ed., 256]: 'The primary cause may be the proximate cause of a disaster, though it operates through successive instruments, as an article at the end of a chain may be moved by force applied to the other end, that force being the proximate cause of the movement, or, as in the oft-cited case of the squib thrown in the market-place. *Acott v. Shepherd*, 2 W. Bl., 892. The question always is, was there any unbroken connection between the

wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?' This definition is quoted with approval in *Mack v. R. R.*, 52 S. C., 324, 29 S. E., 905, 40 L. R. A., 679 [68 Am. St. Rep., 913]. This Court then says: 'There may be a succession of intermediate causes, each produced by the one preceding, and producing the one following it. It must appear that the injury was the natural consequence of the wrongful act or omission. The new independent intervening cause must be one not produced by the wrongful act or omission, but independent of it, and adequate to bring the injurious results.' "

In *James v. Fountain Inn Mfg. Co.*, 80 S. C., 232, 61 S. E., 391, the Court said:

"The evidence tended to show that the machinery was in a defective condition as the result of defendant's negligence, that it was usual when the hook failed to pick up the dash-pot for the operator, instead of stopping the machinery, to press his hand on the spring of the hook so that it would catch on to the rod or arm of the dash-pot, and that the operator was expected to do this. The placing of his hand on the machinery while in motion was the probable and natural result to be anticipated from the defective condition of the machinery, and the order to remedy the defect in the usual way without stopping the machinery. The slipping of the hand so as to be caught in the machinery was not the result of some intervening force or agency, but was the result of the pressure of the plaintiff's hand upon the moving hook, an act he was expected and required to do."

In *Martin v. Southern R. Co.*, 77 S. C., 370, 58 S. E., 3, 122 Am. St. Rep., 574, the Court said:

"If there be an intervening cause and the prior cause do nothing more than give rise to the circumstances under

which the injury occurs, then such prior cause cannot be said to be the proximate cause."

See, also, *Foster v. City of Union,* 129 S. C., 257, 123 S. E., 839; *Carter v. Atlantic Coast Line R. Co.,* 109 S. C., 119, 95 S. E., 357, 11 A. L. R., 1411; *State v. Des Champs,* 126 S. C., 420, 120 S. E., 491; *Miller v. Atlantic Coast Line R. Co.,* 140 S. C., 162, 138 S. E., 675.

The Federal decisions are strong in support of the rule announced by our own decisions.

In *Milwaukee R. Co. v. Kellogg,* 94 U. S., 469, 24 L. Ed., 256, the Court said:

"The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances. These circumstances, in a case like the present, are the strength and direction of the wind, the combustible character of the elevator, its great height and the proximity and combustible nature of the sawmill and the piles of lumber. Most of these circumstances were ignored in the request for instruction to the jury. Yet it is obvious that the immediate and inseparable consequences of negligently firing the elevator would have been very different if the wind had been less, if the elevator had been a low building constructed of stone, if the season had been wet, or if the lumber and the mill had been less combustible. And the defendants might well have anticipated or regarded the probable consequences of their

negligence as much more far reaching than would have been natural or probable in other circumstances. We do not say that even the natural and probable consequences of a wrongful act or omission are in all cases to be chargeable to the misfeasance or nonfeasance. They are not when there is sufficient and independent cause operating between the wrong and the injury. In such a case the resort of the sufferer must be to the originator of the intermediate cause. But when there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it. The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault, and self-operating, which produced the injury. Here lies the difficulty. But the inquiry must be answered in accordance with common understanding. In a succession of dependent events an interval may always be seen by an acute mind between a cause and its effect, though it may be so imperceptible as to be overlooked by a common mind. Thus, if a building be set on fire by negligence, and adjoining building be destroyed without any negligence of the occupants of the first, no one would doubt that the destruction of the second was due to the negligence that caused the burning of the first. Yet in truth, in a very legitimate sense, the immediate cause of the burning of the second was the burning of the first. The same might be said of the burning of the furniture in the first. Such refinements are too minute for rules of social conduct. In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time."

In *Washington & G. R. Co. v. Hickey,* 166 U. S., 521, 17 S. Ct., 661, 41 L. Ed., 1101:

"The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train."

In *Cannon v. Lockhart Mills,* 101 S. C., 59, 85 S. E., 233, the Court said:

"Where, in the sequence of events between the original default and the final mischief an entirely independent and unrelated cause intervenes, and is of itself sufficient to stand as the cause of the mischief, the second cause is ordinarily regarded as the proximate cause and the other as the remote cause. [*Louisiana Mut.*] *Insurance Co. v. Tweed,* 7 Wall., 44, 52 [19 L. Ed., 65]. This is emphatically true when the intervening cause is the act of some person entirely unrelated to the original actor."

"His insanity, as a cause of his final destruction, was as little the natural or probable result of the negligence of the railway officials as his suicide, and each of these are casual or unexpected causes, intervening between the act which injured him and his death."

In *Chicago, St. P., M. & O. R. Co. v. Elliott* (C. C. A.), 55 F., 951, 20 L. R. A., 582:

"An injury that is the natural and probable consequence of an act of negligence is actionable. But an injury that could not have been foreseen or reasonably anticipated as the probable result of the negligence is not actionable, nor is an injury that is not the natural consequence of the negligence complained of, and would not have resulted from it, but for the interposition of some new, independent cause, that could not have been anticipated."

In *St. Louis & S. F. R. Co. v. Bennett* (C. C. A.), 69 F., 525: An injury that is natural and probable consequence of

acts of negligence is actionable, but an injury that could not have been foreseen or reasonably anticipated as a probable result of the negligence is not actionable.

The intervention of the independent act of a third person between the wrong complained of and the injury, which act was the immediate cause of the injury, has been made a test of that remoteness of damages which forbids recovery. *Louisiana Mut. Ins. Co. v. Tweed,* 7 Wall., 44, 19 L. Ed., 65.

In The Paunpeck (C. C. A.), 86 F., 924:

"No liability attaches to an act of negligence for a result which could not have been foreseen, or reasonably anticipated as the probable consequence, and would not have been induced but for the interposition of a new and independent cause."

In *St. Louis-San Francisco R. Co. v. Mills,* 271 U. S., 344, 46 S. Ct., 520, 70 L. Ed., 979, the railroad company furnished a single guard to protect a strike-breaker as he returned home. He was slain by strikers who boarded the street car in which the strike-breaker and the guard were riding. The negligence alleged was in not supplying sufficient protection. The Court, reversing a judgment of the Circuit Court of Appeals [3 F. (2d), 882] in favor of the plaintiff, said:

"There is a similar absence of evidence of negligent failure by petitioners to fulfill this * * * duty of protection. The burden of proving negligence rested on the respondent. * * * But whether a supply of guards sufficient to meet the emergency was obtainable; what demands were made upon them, and whether there were other guards available for the particular journey when the decedent was killed, are questions on which the record is silent.

"Nor is there evidence from which the jury might infer that petitioner's failure to provide an additional guard or guards, was the proximate cause of decedent's death.

Whether one or more additional guards would have prevented the killing is in the highest degree speculative."

To the same effect are: *Chicago, M. & St. P. R. Co. v. Coogan,* 271 U. S., 472, 46 S. Ct., 564, 70 L. Ed., 1041; *The Lusitania* (D. C.), 251 F., 715; *Orton v. Pennsylvania R. Co.* (C. C. A.), 7 F. (2d), 37; *Atlantic Coast Line R. Co. v. Southwell,* 275 U. S., 64, 48 S. Ct., 25, 72 L. Ed., —; *The Santa Rita* (C. C. A.), 176 F., 890, 30 L. R. A. (N. S.), 1210; *Wellington v. Pelletier* (C. C. A.), 173 F., 911, 26 L. R. A. (N. S.), 719; *American Bridge Company v. Seeds* (C. C. A.), 144 F., 605, 11 L. R. A. (N. S.), 1041; *Goodlander v. Oil Co.* (C. C. A.), 63 F., 400, 27 L. R. A., 583; *Chicago, St. P., M. & O. R. Co. v. Elliott* (C. C. A.), 55 F., 949, 20 L. R. A., 582; *Cole v. German Savings & Loan Soc.* (C. C. A.), 124 F., 113, 63 L. R. A., 416; *Jennings v. Davis* (C. C. A.), 187 F., 703; *Texas & P. R. Co. v. Stewart,* 228 U. S., 357, 33 S. Ct., 548, 57 L. Ed., 875.

The textbooks are equally unanimous upon the proposition: 17 C. J., 734. 715, 750, Watson, Pers. Inj., § 58; 1 La Batt (1st Ed.), § 129 (2d Ed.), § 1570; 29 Cyc., 499; 21 A. & E. Enc. L., 494; Wharton, Neg. (2d Ed.), §§ 134, 138.

The State decisions are equally so: *Burt v. Advertiser Newspaper Co.,* 154 Mass., 238, 28 N. E., 1, 13 L. R. A., 97; *East Tenn., V. & G. R. Co. v. Lockhart,* 79 Ala., 315; *Cuff v. Newark & N. Y. R. Co.,* 35 N. J. Law, 17, 10 Am. Rep., 205; *Mahogany v. Ward,* 16 R. I., 479, 17 A., 860, 27 Am. St. Rep., 753; *Clark v. Wilmington & W. R. Co.,* 109 N. C., 430, 14 S. E., 43, 14 L. R. A., 749; *Lane v. Atlantic Works,* 111 Mass., 139; *Southern R. Co. v. Webb,* 116 Ga., 152, 42 S. E., 395, 59 L. R. A., 109; *Stone v. Boston & Albany R. Co.,* 171 Mass., 536, 51 N. E., 1, 41 L. R. A., 794; *Louisville Home Tel. Co. v. Gasper,* 123 Ky., 128, 93 S. W., 1057, 29 Ky. Law Rep., 578, 9 L. R. A. (N. S.), 548; *Andrews v. Kinsel,* 114 Ga., 390, 40 S. E., 300, 88 Am. St. Rep., 25; *Claypool v. Wigmore,* 34 Ind. App., 35, 71 N. E., 509; *Edgar v. Rio Grande Western R. Co.,* 32 Utah, 330,

90 P., 745, 11 L. R. A. (N. S.), 738, 125 Am. St. Rep.,
867; *Haynes v. North Carolina R. Co.*, 143 N. C., 154, 55
S. E., 516, 9 L. R. A. (N. S.), 972; *Williams v. Iron Co.*,
106 Ala., 254, 17 So., 517; *Glassey v. Worcester Consol. St.
R. Co.*, 185 Mass., 315, 70 N. E., 199; *Nickey v. Steuder*,
164 Ind., 189, 73 N. E., 117; *Leeds v. New York Tel. Co.*,
178 N. Y., 118, 70 N. E., 219; *Missouri Pacific R. Co. v.
Columbia*, 65 Kan., 390, 69 P., 338, 58 L. R. A., 399; *Texas
& N. O. R. Co. v. Murray*, 63 Tex. Civ. App., 340, 132 S.
W., 496; *Smith v. Norfolk & S. R. Co.*, 145 N. C., 98, 58
S. E., 799, 122 Am. St. Rep., 423; *Brubaker v. Kansas City
Light Co.*, 130 Mo. App., 439, 110 S. W., 12; *Ultima Thule,
A. & M. R. Co. v. Benton*, 86 Ark., 289; 110 S. W., 1037;
*Houston & T. C. R. Co. v. Gerald*, 60 Tex. Civ. App., 151,
128 S. W., 167; *Brown v. Amer. Steel & Wire Co.*, 43 Ind.
App., 560, 88 N. E., 81; *Tobler v. Pioneer Co.*, 166 Ala.,
482, 52 So., 95; *Lyons v. Watt*, 43 Col., 238, 95 P., 950;
*Louisville & N. R. Co. v. Keiffer*, 132 Ky., 419, 113 S. W.,
433; *Seith v. Elec. Co.*, 241 Ill., 252, 89 N. E., 425, 24 L.
R. A. (N. S.), 978, 132 Am. St. Rep., 204; *Lewis' Adm'r
v. Taylor Coal Co.*, 112 Ky., 845, 66 S. W., 1044, 57 L. R.
A., 447; *Haney v. Coal Co.* (Tex. Civ. App.), 207 S. W.,
375; *Atlanta & West Point R. Co. v. Reese*, 28 Ga. App.,
275, 110 S. E., 750; *Saugerties Bank v. Delaware & Hudson Co.*, 236 N. Y., 425, 141 N. E., 904; *Louisville & N.
R. Co. v. Daniels*, 135 Miss., 33, 99 So., 434, 34 A. L. R.,
516; *Franklin v. Houston Elec. Co.* (Tex. Civ. App.), 286
S. W., 578; *Ragone v. State*, 123 Misc. Rep., 48, 204 N. Y.
S., 178; *Woodcock v. Hallock*, 98 Vt., 284, 127 A., 380;
*Shafer v. Keeley Co.*, 65 Utah, 46, 234 P., 300, 38 A. L.
R., 1523; *Fraser v. Chicago, R. I. & P. R. Co.*, 101 Kan.,
122, 165 P., 831, L. R. A. 1917-F, 749; *Stephens v. Ry. Co.*,
28 Okl., 340, 114 P., 611, 33 L. R. A. (N. S.), 1007.

The Massachusetts Court defines "proximate cause" as
the "active efficient cause, setting in motion events bringing
about result without intervention of force started from in-

dependent source." *Slater v. T. C. Baker Co.* (Mass.), 158 N. E., 778.

In Shear & Red. Neg. (6th Ed.), § 34, it is said:

"If such a person could have anticipated that the intervening act of negligence might in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another. If it could not have been thus anticipated, then the intervening negligent person alone is responsible."

See, also, *American Bridge Co. v. Seeds* (C. C. A.), 144 F., 605, 11 L. R. A. (N. S.), 1041, which contains a full discussion of the question.

In Watson, Pers. Inj., § 70, it is said:

"The nature of the intervening cause which will render an original cause for which the author is sought to be held liable in damages too remote for recovery must be simply such as interrupts the usual and ordinary and experienced sequence of events, and produces consequences at variance therewith."

In *Western Union Tel. Co. v. Schriver* (C. C. A.), 141 F., 538, 4 L. R. A. (N. S.), 678, the Court said:

"An injury is not actionable which would not have resulted from the act of negligence except for the interposition of an independent cause."

In *Sturgis v. Kountz,* 165 Pa., 358, 30 A., 976, 27 L. R. A., 390, the Court said:

" * * * But the primary [cause] is by no means always the natural and probable cause of the particular injury. It is not when there is a sufficient and independent cause between it and the injury. In such case resort must be had by the sufferer to the originator of the intermediate cause."

In *Wolff Mfg. Co. v. Wilson,* 152 Ill., 9, 38 N. E., 694, 26 L. R. A., 229, the Court said:

"The rule may be stated that if, subsequent to the original wrongful or negligent act, a new cause intervened, of

itself sufficient to stand as the cause of the injury, the former must be considered too remote, unless the original wrongful act was in and of itself a violation of some law or ordinance."

In *Atchison, T. & S. F. R. Co. v. Calhoun,* 213 U. S., 1, 29 S. Ct., 321, 53 L. Ed., 671, the Court said:

"Where, in the sequence of events between the original default and the final mischief and entirely independent and unrelated cause intervenes, and is of itself sufficient to stand as the cause of the mischief, the second cause is ordinarily regarded as the proximate cause and the other as the remote cause. * * * This is emphatically true when the intervening cause is the act of some person entirely unrelated to the original actor."

The Court quotes with approval the following from Pollick on Torts (8th Ed.), 41:

"If men went about to guard themselves against every risk to themselves or others which might, by ingenious conjecture, be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things."

I do not think that there can be a doubt but that the act of Braddock in driving into the alleged steam screen, when, according to his own statement, he could not see ahead of him for a distance sufficient to avoid striking the boy, was an act of negligence; that it supervened the alleged negligence of the railroad company, and was, therefore, the proximate cause of the injury; but, according to authorities, the intervening act, if it directly caused the injury, and was not induced by the alleged prime act of negligence on the part of the defendant, need not have been either wrongful or negligent, in order to insulate the prime act.

In 22 R. C. L., 134, § 18, it is said:

"Some of the authorities hold that no cause can operate as an intervening cause and thereby insulate the previous negligence of the defendants, unless it is wrongful; but the better rule, and the one generally adopted, is that to have this effect the intervening cause need not be one involving negligence or wrong. When an adequate intervening cause is found, it is immaterial whether that cause is one involving liability or not. It is enough that it is an indpendent, responsible cause"—Citing *Cavanaugh v. Centerville Block Coal Co.,* 131 Iowa, 700, 109 N. W., 303, 7 L. R. A. (N. S.), 907; *Paul v. R. Co.,* 170 N. C., 230, 87 S. E., 66, L. R. A. 1916-B, 1079; *Little Rock & Memphis R. Co. v. Barry* (C. C. A.), 84 F., 944, 43 L. R. A., 349; *Tutein v. Hurley,* 98 Mass., 211, 93 Am. Dec., 154; *Cuff v. Newark & N. Y. R. Co.,* 35 N. J. Law, 17, 10 Am. Rep., 205; note 36 Am. St., 845.

In the wilderness of precedents it is difficult to settle upon a definite touchstone of proximate cause. Some declare the test to be the direct causal connection between the prime act and the injury, or the direct causal connection between the prime act and the intervening direct act which has produced the injury; others, that the injury must have been the reasonably probable result, direct or indirect, of the prime cause, that is, a result which a reasonably prudent person should have anticipated. I prefer, as I have outlined above, the first criterion. Tested by any criterion, I think that it. is clear that the injury was caused directly by the voluntary intervening act of the automobile driver, in no wise induced by the alleged negligent act of the railroad company in producing the obstruction at the crossing complained of.